[No. A052422. First Dist., Div. One. Apr. 9, 1992.]

RIO VISTA FARM BUREAU CENTER et al., Plaintiffs and Appellants, v. COUNTY OF SOLANO et al., Defendants and Respondents.

## COUNSEL

Gorman & Waltner, Alan Waltner and Roy Gorman for Plaintiffs and Appellants.

Thomas H. Gordinier, County Counsel, and James W. Laughlin, Deputy County Counsel, for Defendants and Respondents.

## OPINION

STEIN, J.—Appellants brought an action challenging the adoption by respondent County of Solano of a hazardous waste management plan (the

Plan) and certification of a final environmental impact report (FEIR).[1] The trial court found that respondent had complied with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[2] and the Tanner Act (Health & Saf. Code, § 25135 et seq. and § 25199 et seq.) in adopting the Plan and certifying the FEIR, and rendered judgment for the County; the trial court also dismissed appellant's action against the DHS.

THE PLAN

The Plan adopted by respondent was the culmination of an effort which commenced in March of 1987 with a resolution by the board of supervisors to "prepare a county hazardous waste management plan" for submittal to the DHS for approval pursuant to the Tanner Act. The stated purpose of this Plan was to review and analyze existing hazardous waste disposal facilities, determine the need for additional or expanded facilities, and identify "site selection criteria for new or expanded . . . facilities, to accommodate projected needs."

Concurrent with the submission of the Plan for approval, a draft environmental impact report was completed and made available for public review and comment in accordance with CEQA requirements. In April of 1989, the FEIR was certified; approval for the Plan was obtained from the board of supervisors in August of 1989, and from the DHS in February of 1990.

As approved, the Plan constitutes an initial or primary working document to be updated and reviewed periodically. The Plan mentions existing hazardous waste quantities and management programs. Existing facilities within the County for treatment, storage and disposal of hazardous waste are described, as are "out-of-County" facilities to which hazardous waste produced within the County is exported. The Plan also projects future hazardous waste quantities from all sources, factoring in anticipated waste source reductions, and concludes that the County will have a projected capacity of zero in existing facilities and a possible annual "capacity shortfall" by the year 2000. Various future scenarios are suggested—depending upon continued operation of existing County facilities, which currently accept hazardous waste from outside the County—and options are delineated. Among the options stated are identification of out-of-state facilities to receive residual wastes and a new facility in the county to serve as a residuals repository for

---

[1]For the sake of clarity and convenience, we will henceforth refer to appellants in the singular; respondent County of Solano will be referred to as respondent or the County; respondent Department of Health Services will be referred to as the DHS.

[2]All further statutory references are to the Public Resources Code unless otherwise indicated.

"primarily Northern California generators."[3] The Plan concludes that even with source reduction programs, "there will still be a need for facilities, either in-County or out-of-County, to treat, store and dispose of hazardous waste . . . ."

The Plan contains a siting analysis of treatment, storage and disposal (TSD) facilities, including the regulatory context of future facility proposals, the criteria for siting proposals in accordance with DHS guidelines, and "general areas" within the County which meet the stated criteria.[4] Relying upon DHS guidelines, as modified slightly to suit the particular needs and characterizations of the County, the Plan describes the siting criteria, which are divided into the following categories: location specific criteria; high hazard criteria; public safety criteria; and physical limitations of the site area.

The Plan then applies the siting criteria to various areas of the County and designates those areas with potential suitability for siting of hazardous waste facilities under all the stated criteria, as well as those areas which meet siting criteria with "risk assessments and/or engineering measures," and other areas excluded from possible siting consideration.[5] The Plan concludes that the County has locations which potentially or conditionally meet siting criteria for both TSD facilities and residuals repositories. The primary acceptable area falls within the southeastern part of the County and is known as Montezuma Hills.

The Plan does not select or recommend any specific sites for hazardous waste disposal facilities. Rather, the Plan designates certain areas in the County which have been identified as potentially consistent with siting criteria for TSD facilities. It notes that these are general areas only and not recommended sites. The Plan states, "Actual sites proposed for future facilities will be given close scrutiny under the County and appropriate city's development review process as well as federal and state review . . . ." The

---

[3] A facility to serve only the County is not deemed economically feasible.

[4] The Tanner Act provides that among the elements which must be included in a hazardous waste management plan submitted to the DHS are "[a]n identification of those hazardous waste facilities that can be expanded to accommodate projected needs and an identification of general areas . . . for new hazardous waste facilities determined to be needed. In lieu of this facility and *area* identification, the plan may instead include siting criteria to be utilized in selecting sites for new hazardous waste facilities. If siting criteria are included in the county hazardous waste management plan, the plan shall also designate general areas where the criteria might be applicable." (Health & Saf. Code, § 25135.1, subd. (d)(6).) Thus, counties are given the option of identifying facilities and areas or providing siting criteria.

[5] Under DHS guidelines, any hazardous waste disposal plan submitted under the Tanner Act is expected to show that the County has actual areas which meet siting criteria.

Plan further observes "Actual siting requires extensive interagency review for the land-use compatibility and environmental impact of any proposed TSD facility."

The Plan contains policies and programs for future management and disposal of hazardous wastes. One of these policies is to ensure adequate facility capacity by determining what additional waste management facilities are appropriate, if any, for location in the County. Another stated policy is to "ensure that existing and future hazardous waste management facilities . . . in Solano County are developed and operated in an environmentally sound manner through appropriate management, legislation, enforcement and the environmental impact process (California Environmental Quality Act)."

The Plan commits the County to work towards fair-share agreement among counties, whereby each county takes responsibility for its fair share of waste management. To implement this policy, the Plan advises that if the siting of a particular type of hazardous waste management facility needed in the county is not environmentally appropriate or economically viable, the county shall seek to reach an agreement with one or more other jurisdictions to facilitate the siting of a larger, environmentally appropriate and economically viable facility (or facilities) to be located in the county or elsewhere.

The Plan further warns that some TSD facility impacts may be difficult to mitigate. In addition to the direct costs for increased emergency response, inspection, infrastructure, and other county services, the Plan recognizes that TSD facilities impose a number of indirect impacts. "The siting of a TSD facility, particularly a residuals repository, may impose long-term or permanent changes in land-use patterns. These changes will affect not only the facility and its immediate vicinity, but also areas the public may view as deleteriously altered by the facility's presence. . . . Although mitigation of many of these may be addressed during the permitting and CEQA process, long-term prediction of all impacts is not possible, even assuming well-operated facilities."

The Plan is characterized as a "first assessment of County needs and resources" to "serve as a strong foundation for an ongoing process." It is contemplated that the Plan will be reviewed and updated periodically.

## THE FINAL ENVIRONMENTAL IMPACT REPORT

The FEIR describes the Plan as the "primary planning document for hazardous waste management in the County." The FEIR notes that the Plan itself would have no direct adverse impacts on the environment and should

result in beneficial impacts through improved and safer management of the county's hazardous wastes. The FEIR recognizes that the Plan could allow certain projects to proceed, which could have adverse impacts, such as potential future hazardous waste facilities, upon a finding of consistency with the Plan.

The FEIR summarizes the "key features" of the project under evaluation——that is, the Plan. The siting criteria contained in the Plan are reiterated in the FEIR, as are the areas which potentially meet those criteria. The policies and recommended programs mentioned in the Plan are also restated.

The FEIR describes the following alternatives to be evaluated: adoption of the Plan; no adoption of a hazardous waste management plan (the No Project Alternative); adoption of a different hazardous waste management plan which limits facilities to local needs only (the Local Needs Alternative); and a plan which would exclude the siting of any new facility in the County (the No Facilities Alternative). The FEIR notes that without a hazardous waste management plan, siting of future facilities "would probably be less difficult," but "the net effect would be a reduction in the County's control over facility siting" and loss of the "environmental benefits" associated with the siting criteria stated in the Plan. "The Local Needs Alternative would have the effect of discouraging the import of hazardous waste for treatment, storage or disposal within Solano County, but would encourage the siting and operation of new treatment and storage facilities to manage hazardous waste generated in Solano County." The FEIR concludes that "Volumes of hazardous waste generated in Solano County, however, may not be large enough to support treatment or disposal facilities, and it is likely that all Solano wastes would be exported for treatment and disposal under this alternative." According to the FEIR, the No Facilities Alternative would require preparation of a different hazardous waste management plan which excludes new facilities "through changes in facility siting criteria and other restrictions." The FEIR states that "it is unknown if adequate out-of-County treatment, storage and disposal facility capacity would be available for waste generated in-County."

The environmental setting and potential impacts due to adoption of the Plan, including the potential for future facility siting in accordance with the stated siting criteria, are discussed in the FEIR. General impacts upon various articulated resource categories associated with operation of transfer stations, recycling facilities, incinerators, stabilization facilities and residuals

repositories are outlined. Within each resource category,[6] impacts are stated and mitigation measures are noted for each of the cited alternatives. Cumulative impacts are also discussed in general terms for possible future siting of one or more hazardous waste facilities in the County, along with reduction measures.

For each of the alternatives, the FEIR also notes the possible significant irreversible adverse environmental impacts, "including potential loss of biotic habitat and long-term or permanent change in the character of land use." Mitigation measures for such irreversible environmental impacts are mentioned. The FEIR generally indicates that mitigations will be more effectively implemented under the Plan, which gives the County a greater degree of control over siting and management of hazardous waste facilities. The FEIR again posits that each specific facility may have different potential consequences, such that specific irreversible impacts and mitigation measures are more appropriately discussed in "future CEQA documents for any proposed facility." The FEIR adds the following caveat: "The siting and approval of specific hazardous waste facilities will require separate environmental reviews that will likely take the form of Project EIR's [*sic*] (Section 15161, CEQA Guidelines)."

DISCUSSION

Appellant argues that the FEIR does not comply with CEQA requirements. Appellant's position is that the Plan has effectively designated the Montezuma Hills area as one of the few regions within the County which satisfies the siting criteria for hazardous waste facilities without further risk assessments or engineering measures. Appellant submits that the FEIR is flawed in its failure to provide an adequate description of the project—which, claims appellant, narrowed "acceptable sites to the Montezuma Hills area"—and does not contain the findings demanded by CEQA to support the decisions made in the Plan.

■ Our analysis must proceed from recognition of fundamental principles underlying CEQA, foremost of which is that "the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (hereafter *Laurel Heights*) (1988) 47 Cal.3d 376, 390

---

[6]The resource categories are as follows: Air quality; water quality and hydrology; geology and soils; biotic resources; visual resources; transportation and circulation; noise; utilities and service; historic and archaeological resources; and general public sector impacts.

[253 Cal.Rptr. 426, 764 P.2d 278].) With narrowly drawn exceptions, all local governmental agencies are required by CEQA to prepare an environmental impact report (EIR) for any project which "may have a significant effect on the environment." (§ 21151; *Oro Fino Gold Mining Corp.* v. *County of El Dorado* (1990) 225 Cal.App.3d 872, 880 [274 Cal.Rptr. 720]; *Citizen Action to Serve All Students* v. *Thornley* (1990) 222 Cal.App.3d 748, 753 [272 Cal.Rptr. 83].) ■ The EIR has been described as the "heart of CEQA"; it is an "environmental alarm bell" which has the objective of alerting the public and governmental officials to the environmental consequences of decisions before they have reached ecological points of no return. (*Schaeffer Land Trust* v. *San Jose City Council* (1989) 215 Cal.App.3d 612, 620 [263 Cal.Rptr. 813]; *Citizens for Quality Growth* v. *City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 438 [243 Cal.Rptr. 727]; *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1986) 183 Cal.App.3d 229, 241 [227 Cal.Rptr. 899].)

"The EIR is an informational document with the stated purpose of providing public agencies and the public with 'detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.]" (*City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1449 [263 Cal.Rptr. 340].) ■ "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. ■■■■ An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . ." (Cal. Code Regs., tit. 14, § 15151;[7] *Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852, 862 [226 Cal.Rptr. 575].) Technical perfection is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure. (Guidelines, § 15151; *Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650]; *Towards Responsibility in Planning* v. *City Council* (1988) 200 Cal.App.3d 671, 679 [246 Cal.Rptr. 317]; *Citizens of Goleta Valley* v. *Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1176-1177 [243 Cal.Rptr. 339].)

■ "Judicial review of administrative decisions under CEQA is governed by sections 21168 and 21168.5 of the Public Resources Code. Under

_____

[7]All references to Guidelines are to the CEQA Guidelines, promulgated by the State Resources Agency and found in title 14 of the California Code of Regulations, section 15000 et seq. The Guidelines are accorded great weight by the courts in interpreting the provisions of CEQA. (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564, fn. 3 [276 Cal.Rptr. 410, 801 P.2d 1161]; *Laurel Heights, supra,* 47 Cal.3d at p. 391, fn. 2.)

these sections the questions for the court are: '(1) whether there is any substantial evidence in light of the whole record to support the decision; and (2) whether the agency making the decision abused its discretion by failing to proceed in the manner required by law.' [Citation.]" (*Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 259-260 [232 Cal.Rptr. 772], fns. omitted.) "Thus, the reviewing court ' "does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." ' [Citations.] We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 564; see also *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1513 [258 Cal.Rptr. 267].)

■ Our limited function is to determine " 'whether policymakers have been adequately informed of the consequences of their decisions, and whether the public has sufficient information to evaluate the performance of their elected officials.' [Citation.]" (*Schaeffer Land Trust* v. *San Jose City Council, supra,* 215 Cal.App.3d at p. 620.) In so doing, we may not "substitute our judgment for that of the people and their local representatives." (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 564.) Neither may we "reconsider or reevaluate the evidence presented to the administrative agency. [Citation.] All conflicts in the evidence and any reasonable doubts must be resolved in favor of the agency's findings and decision. [Citation.]" (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 197 Cal.App.3d at p. 1177.)

I. *Adequacy of Project Description*

■ Appellant contends that the "fundamental flaw" in both the FEIR and the Plan is an inadequate, vague and uncertain description of the project under evaluation. Appellant characterizes the project description in the FEIR as " 'vague and shifting,' " and even internally inconsistent in its treatment of future siting decisions. The result, submits appellant, is a FEIR which fails to define decisions or make the requisite findings as to environmental impacts, possible mitigations and project alternatives. Thus, claims appellant, has the "entire CEQA process" been undermined.

■ An accurate description of the proposed project is "the heart of the EIR process." (*Sacramento Old City Assn.* v. *City Council* (1991) 229 Cal.App.3d 1011, 1023 [280 Cal.Rptr. 478].) "An accurate project description is necessary for an intelligent evaluation of the potential environmental

effects of a proposed activity. [Citation.]" (*McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439].) " 'A curtailed or distorted project description may stultify the objectives of the reporting process. Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance. An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR.' " (*Sacramento Old City Assn. v. City Council, supra,* at p. 1023.)

■ To further the objectives of CEQA, the term "project"[8] is defined broadly as any "activity which is being approved and which may be subject to several discretionary approvals by governmental agencies." A project encompasses "the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately . . . ." (Guidelines, § 15378, subds. (a), (c); *McQueen v. Board of Directors, supra,* 202 Cal.App.3d at p. 1143.) "A narrow view of a project could result in the fallacy of division [citation], that is, overlooking its cumulative impact by separately focusing on isolated parts of the whole. [Citations.]" (202 Cal.App.3d at p. 1144.)

■ CEQA contemplates consideration of environmental consequences at the " 'earliest possible stage, even though more detailed environmental review may be necessary later.' " (*Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1346 [272 Cal.Rptr. 372].) The requirements of CEQA cannot be avoided by piecemeal review which results from "chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences." (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 [118 Cal.Rptr. 249, 529 P.2d 1017]; *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1333 [232 Cal.Rptr. 507].) Thus, "reasonably anticipated future projects" must be considered in an EIR and discussed in a cumulative analysis. (*Laurel Heights, supra,* 47 Cal.3d at p. 394; *City of Santee v. County of San Diego, supra,* 214 Cal.App.3d at p.

---

[8]"The term 'project' does not mean each separate governmental approval. [¶] . . . Where the lead agency could describe the project as either the adoption of a particular regulation . . . or as a development proposal which will be subject to several governmental approvals . . . the lead agency shall describe the project as the development proposal for the purpose of environmental analysis." (Guidelines, § 15378, subds. (c) and (d); see also *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 795 [187 Cal.Rptr. 398, 654 P.2d 168]; *City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438, 1452 [263 Cal.Rptr. 340].)

1452.) "Only in this manner can two or more individual effects be considered together to determine the overall environmental impact." (*Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 904 [223 Cal.Rptr. 379].)

■ The project described in the FEIR is respondent's adoption of a hazardous waste management plan, which was incorporated into the County's general plan. A comparison of the FEIR and the Plan—which were circulated and considered concurrently—shows a consistency of description of the project. As accurately described in the FEIR, the Plan serves as a preliminary guide or "first assessment" of the County's present and future hazardous waste management needs. An overview of the Tanner Act and DHS guidelines for preparation of hazardous waste management plans—in accordance with which the Plan has been prepared—is found in the FEIR. Current facilities are assessed; projections are provided for future needs. Most significant is the statement in the FEIR of recommended policies and siting criteria which the Plan provides. The FEIR further adopts from the Plan the maps depicting areas within the County which meet the siting criteria. In all respects the project stated in the Plan is faithfully reiterated in the FEIR.

Appellant's complaint is that the FEIR fails to provide a description of potential future facilities or the "degree to which project-level decisions" have been made by the County. Appellant insists that such reasonably anticipated future projects were improperly omitted from consideration by the County.

The flaw in appellant's argument is that the Plan makes no commitment to future facilities other than furnishing siting criteria and designating generally acceptable locations. While the Plan suggests that new facilities may be needed by the County, no siting decisions are made; the Plan does not even determine that future facilities will ever be built. Both the Plan and the FEIR consistently state that no actual future sites have been recommended or proposed. For that reason, the FEIR is intended to be a "program EIR" or "tiering EIR," with subsequent "project EIR's" to follow in the event specific, identified facilities are proposed in the future.[9]

The omission of any description of specific potential future facilities—such as in the Montezuma Hills area—does not, in our view, render the FEIR

---

[9]As observed in *Laurel Heights*, section 15168, subdivision (a) of the Guidelines explains "that an agency can use a 'program EIR,' for 'a series of actions that can be characterized as one large project and are related either: (1) Geographically, (2) As logical parts in the chain of contemplated actions, . . . or (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways.' Section 15385 of the Guidelines provides for

deficient. The Plan is not a project development proposal which contemplates additional development or even the acquisition of property for future facilities without further consideration of environmental consequences or upon issuance of a negative declaration. (*Laurel Heights, supra,* 47 Cal.3d at p. 398; *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at pp. 279-280; *McQueen* v. *Board of Directors, supra,* 202 Cal.App.3d at p. 1146; *No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 233 [242 Cal.Rptr. 37]; *City of Antioch* v. *City Council, supra,* 187 Cal.App.3d at p. 1335; *Heninger* v. *Board of Supervisors* (1986) 186 Cal.App.3d 601, 610 [231 Cal.Rptr. 11].) The Plan does not propose a single project divided into parts; it merely serves as a hazardous waste management assessment and overview, with any separate future projects, when identified, to be accompanied by additional EIR's. Repeated commitments are made in both the Plan and the FEIR for preparation of future CEQA documents prior to approval, upon a finding of consistency with the Plan, of any hazardous waste management facilities.

 "CEQA requires consideration of the potential environmental effects of the project actually approved by the public agency, not some hypothetical project." (*McQueen* v *Board of Directors, supra,* 202 Cal.App.3d at p. 1146.) " '[W]here future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences.' [Citation.]" (*Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at p. 738.)
 " '[A]n EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA. . . . [¶] Under this standard, the facts of each case will determine whether *and to what extent an EIR must analyze future expansion or other action.*' " (*Laurel Heights, supra,* 47 Cal.3d at p. 396, italics added; see also *Sacramento Old City Assn.* v. *City Council, supra,* 229 Cal.App.3d at pp. 1024-1025.)

 While we agree with appellant that additional hazardous waste facilities in the County may be a foreseeable consequence of the Plan, any

'tiering' of EIR's, which is 'the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs . . . .' " (47 Cal.3d at p. 399, fn. 8; see also *City of Santee* v. *County of San Diego, supra,* 214 Cal.App.3d at p. 1453.)

such facility would not alter the nature or scope of the initial assessment considered in the FEIR, which functions independently as merely a general planning device. The Plan is not, as we read it, the first part of a fragmented project; rather, it provides the general guidelines required by law for any separate, but as yet undetermined, future hazardous waste management project. The scope of the Plan, as appropriately described in the FEIR, is limited to recitation of policies, requirements, and siting criteria, and designation of general areas in which future facilities may permissibly be located. No specific facility has been proposed, and the County has not committed to a definite course of action. Moreover, any future projects have been expressly made contingent upon CEQA compliance. The Plan is easily divisible from any potential future projects, which the County has committed to subjecting to the EIR process if and when a specific hazardous waste facility is proposed.

■■■ CEQA requires only that an EIR discuss "[t]he significant environmental effects of the proposed project." (§ 21100, subd. (a); *Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1030 [185 Cal.Rptr. 41].) An EIR is not required for an element of a master plan which has not been proposed for development. (*Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 291 [152 Cal.Rptr. 585].) ■■ ■■ Where, as here, an EIR cannot provide meaningful information about a speculative future project, deferral of an environmental assessment does not violate CEQA. (*Towards Responsibility in Planning* v. *City Council, supra,* 200 Cal.App.3d at p. 681; *No Oil, Inc.* v. *City of Los Angeles, supra,* 196 Cal.App.3d at p. 237.) The County has not impermissibly approved a project which envisions future action without future environmental review. (Cf. *Leonoff* v. *Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1347; *Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 308 [248 Cal.Rptr. 352]; *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 168-169 [217 Cal.Rptr. 893].) Instead, the FEIR properly commits the County to future EIR's in the event a specific facility is proposed. (*Sacramento Old City Assn.* v. *City Council, supra,* 229 Cal.App.3d at pp. 1028-1029.) We accordingly conclude that respondent did not improperly segment the project or provide an inadequate description of the project in the FEIR. (*Id.* at p. 1023.)

## II. *Adequacy of the Findings*

We next consider appellant's claim that the EIR contains inadequate findings on environmental impacts, mitigation measures, and alternatives.

██ ██ Pursuant to section 21081, upon identification of significant environmental effects due to implementation of a project, approval of the project must be preceded by completion of an EIR which includes one or more of the following written findings: "(a) Changes or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report. . . . [¶] (c) Specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report." (See also *Citizens for Quality Growth* v. *City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 440 [243 Cal.Rptr. 727].)[10] These findings must be made for each significant environmental effect, accompanied by a supporting statement of facts. (Guidelines, § 15091; *Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 896 [236 Cal.Rptr. 794].) The basis of any conclusion must be explained in the findings. (§§ 21061, 21100, 21151; Guidelines, § 15128; *Citizens to Preserve the Ojai* v. *County of Ventura* (1985) 176 Cal.App.3d 421, 429 [222 Cal.Rptr. 247].) A "good faith, reasoned analysis" is required; "[c]onclusory statements unsupported by factual information will not suffice." (*Towards Responsibility in Planning* v. *City Council, supra,* 200 Cal.App.3d at p. 683; Guidelines, § 15088, subd. (b).)

██ In reviewing the adequacy of the findings in the FEIR, we are guided by the principle that EIR requirements must be sufficiently flexible to encompass vastly different projects with varying levels of specificity. (*City of Antioch* v. *City Council, supra,* 187 Cal.App.3d at p. 1337.) "The degree of specificity in an EIR need only correspond to the degree of specificity involved in the underlying activity which is described in the EIR." (*Towards Responsibility in Planning* v. *City Council, supra,* 200 Cal.App.3d at p. 681; *Atherton* v. *Board of Supervisors* (1983) 146 Cal.App.3d 346, 350-351 [194 Cal.Rptr. 203]; Guidelines, § 15147.) Thus, an EIR on the adoption of a general plan, such as is under scrutiny here, must focus on secondary effects of adoption, but need not be as precise as an EIR on the specific projects which might follow. (Guidelines, § 15146, subd. (b); *City of Carmel-by-the-Sea* v. *Board of Supervisors, supra,* 183 Cal.App.3d at p. 250.) The difficulty of assessing future impacts of adopting a general level plan does not excuse preparation of an EIR, but merely reduces the level of specificity demanded and shifts the focus to secondary effects. (*City of Antioch* v. *City Council, supra,* at p. 1337.)

---

[10]Once "the required findings as to environmental impacts have been made, a public agency may still adopt a project with adverse environmental consequences, provided it either adopts mitigation measures or finds that overriding considerations justify the project notwithstanding unmitigated adverse consequences. [Citations.]" (*No Slo Transit, Inc.* v. *City of Long Beach* (1987) 197 Cal.App.3d 241, 257 [242 Cal.Rptr. 760].)

In all cases, the sufficiency of the information contained in an EIR is reviewed in light of what is reasonably feasible. (Guidelines, § 15151; *Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at p. 733.) At minimum, an EIR "must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights, supra,* 47 Cal.3d at p. 405.)

### A. *Findings on Environmental Impacts*

Appellant complains that the findings on environmental impacts and the environmental setting were "artificially truncated" in the FEIR due to lack of "a reasonable forecast" of the specific facilities required to meet stated future hazardous waste treatment and disposal needs. Appellant's position is that the Plan, if implemented by construction of a new facility, "logically operates with reasonable certainty to ensure that when a specific facility is proposed, it will be located in Montezuma Hills."[11] Thus, the FEIR is deficient in its failure to discuss the environmental impacts of locating a hazardous waste facility in the Montezuma Hills area.

We find no flaws in the findings on environmental impacts. For the various "resource categories," and for each alternative, the FEIR discusses in general terms the environmental impacts and mitigation measures included in the Plan; also mentioned are the beneficial impacts of proceeding in accordance with the siting criteria stated in the Plan. Cumulative impacts and significant irreversible environmental impacts are discussed in the same manner. The FEIR states that the Plan could allow certain projects to proceed, such as potential future hazardous waste facilities, but properly defers more specific environmental reviews—presumably in the nature of project EIR's—until such facilities, if any, are actually proposed. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 196 Cal.App.3d at p. 237.) Considering the speculative nature of any secondary effects from an uncertain future facility, which will be subject to its own separate environmental review, we conclude that no further findings on environmental impacts or the rationale for such findings was reasonably required from the FEIR. (*Schaeffer Land Trust* v. *San Jose City Council, supra,* 215 Cal.App.3d at p. 632; *Towards Responsibility in Planning* v. *City Council, supra,* 200 Cal.App.3d at p. 681.) "[S]peculative possibilities are not substantial evidence of environmental impact. [Citation.]" (*Citizen Action to Serve All Students* v. *Thornley, supra,* 222 Cal.App.3d at p. 756.) The proposed project has been fully evaluated for

---

[11]This is so, maintains appellant, because "[o]ver 90% of the area designated to satisfy the siting criteria was located in the 40,000 acre Montezuma Hills tract."

environmental impacts in the FEIR; any omitted specific discussions "are of other projects, not the project under consideration." (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d at p. 1031.)

### B. *Findings on Mitigation Measures*

Appellant also objects to the findings in the FEIR on mitigation measures and feasible alternatives. ▊▊ Our high court has declared: "The core of an EIR is the mitigation and alternatives sections." (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 564.) One of the fundamental objectives of CEQA is to facilitate the identification of "feasible alternatives or feasible mitigation measures which will avoid or substantially lessen" significant environmental effects. (§ 21002; *Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 197 Cal.App.3d at p. 1182.) "An environmental impact report must identify proposed mitigation measures as well as alternatives to the proposed project. [Citation.] ▊▊ However, CEQA does not require analysis of every *imaginable* alternative or mitigation measure; its concern is with *feasible* means of reducing environmental effects. . . . [¶] 'Feasible' is defined as 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' [Citation.] 'The statute does not demand what is not realistically possible, given the limitation of time, energy and funds.' [Citation.] Instead the requirement that the EIR identify alternatives and mitigating measures 'must be judged against a rule of reason.' " (*Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1083-1084 [230 Cal.Rptr. 413].)

▊▊ As to the requirement of findings on mitigation measures, appellant submits that the FEIR is deficient in several respects, the first being that the findings on mitigation measures are vague, inconclusive, and even inconsistent, as a result of respondent's failure to adopt more specific findings until a particular hazardous waste facility is proposed. We have no dispute with appellant's position that an environmental assessment, including a statement of mitigation measures, may not be deferred until a future study or project. (Guidelines, § 15070, subd. (b)(1); *Sundstrom* v. *County of Mendocino, supra,* 202 Cal.App.3d at pp. 306-307.) Mitigation measures must be stated for each significant impact identified in the EIR. (Guidelines, § 15126, subd. (c).) We do not agree with appellant, however, that the FEIR ignored mitigation measures or stated them inconclusively, given the broad, nebulous scope of the project under evaluation. In the absence of a specific proposal for a facility, mitigation findings properly focused on use of the stated siting

criteria and other methods to mitigate identified impacts within the noted resource categories, wherever in the County a future facility might be permissibly located under the Plan. The general statement of mitigation measures in the FEIR is consistent with the general nature of the Plan. Any further and more detailed statement of mitigation measures at this formative stage in the County's hazardous waste disposal plan would have been neither reasonably feasible nor particularly illuminating. (*No Slo Transit, Inc.* v. *City of Long Beach, supra,* 197 Cal.App.3d at p. 256.)

Once again, we find significant respondent's adoption of the siting criteria and other mitigation measures to be applied to any future projects. Under the Plan, for those mitigation measures which the County cannot presently formulate precisely absent a proposal for a specific facility, a firm commitment has been made to future mitigation of significant impacts. Where, as here, devising more specific mitigation measures early in the planning process is impractical, " 'the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated.' " (*Sacramento Old City Assn.* v. *City Council, supra,* 229 Cal.App.3d at p. 1029; quoting M. Remy et al., Guide to the Cal. Environmental Quality Act (1991 ed.) pp. 200-201, fn. omitted.)

 Appellant also complains that the FEIR merely "recommends," rather than adopts, some mitigation measures, and "does not identify whether impacts will be mitigated to less than significant levels." Under section 21081, a public agency must incorporate mitigation measures, or make other approved findings, before adopting a project with identified significant environmental impacts. (*Citizens for Quality Growth* v. *City of Mt. Shasta, supra,* 198 Cal.App.3d at p. 442; *Cleary* v. *County of Stanislaus* (1981) 118 Cal.App.3d 348, 362 [173 Cal.Rptr. 390].) As the trial court found, by approving the Plan and the FEIR the County adopted all stated mitigation measures—most of which are contained in the siting criteria. We do not find any flaw in the findings on mitigation measures.

### C. *Findings on Alternatives*

 Next, we consider appellant's objections to the findings on alternatives, with the following fundamental principles in mind: "An EIR must '[d]escribe a range of reasonable alternatives to the project or to the location of the project, which could feasibly attain the basic objectives of the project

and evaluate the comparative merits of the alternatives.' [Citation.] The discussion must 'focus on alternatives capable of eliminating any significant adverse environmental effects or reducing them to a level of insignificance, even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly.' [Citation.]" (*Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at p. 733; see also *Stand Tall on Principles* v. *Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 779 [1 Cal.Rptr.2d 107].) " 'Absolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned. It is only required that the officials and agencies make an objective, good-faith effort to comply.' [Citations.]" (*Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency, supra,* 188 Cal.App.3d at p. 264.)

 "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose." (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 566.) "The range of alternatives is governed by the 'rule of reason,' which requires only an analysis of those alternatives necessary to permit a reasoned choice. An EIR need not consider an alternative, the effect of which cannot be reasonably ascertained and the implementation of which is remote and speculative. 'The statute does not demand what is not realistically possible given the limitation of time, energy, and funds. "Crystal ball" inquiry is not required. . . . An agency need not devote itself to an extended discussion of the environmental impact of alternatives remote from reality such as those which are of speculative feasibility . . . .' [Citation.]" (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 197 Cal.App.3d at pp. 1177-1178.)

 The FEIR discusses three alternatives in addition to the Plan: the No Project Alternative; the Local Needs Alternative; and the No Facilities Alternative. Each of the alternatives is described in the FEIR, and for each alternative, mitigation measures are stated for each resource category.

Appellant contends that the FEIR contains an "inadequate range of alternatives." Appellant's position is that additional alternatives should have been included in the FEIR, such as locating facilities in other areas—perhaps even out-of-county—or placing limits upon size, type and design of facilities.

We conclude that the FEIR, while neither all-encompassing nor perfect, considered a reasonable range of alternatives under the circumstances presented. The discussion of alternatives in the FEIR was tailored to the nature

of the Plan, in which site selection criteria, not specific sites, were proposed. In the context of the Plan, a discussion of the types, sizes and specific locations of facilities would have been speculative, premature and unenlightening. ■ An EIR need not consider " 'an alternative whose effect cannot be reasonably ascertained and whose implementation is deemed remote and speculative [citations].' [Citations.]" (*Bowman* v. *City of Petaluma, supra,* 185 Cal.App.3d at p. 1084.) Neither is an EIR vulnerable " 'because it fails to consider in detail each and every conceivable varia tion of the alternatives stated. [Citations.]' " (*No Slo Transit, Inc.* v. *City of Long Beach, supra,* 197 Cal.App.3d at p. 260; *Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d at p. 1029.) ■ The scope of the Plan is both general and limited; it proposes policies, siting criteria, and area designations for hazardous waste management practices, but does not consider specific sites or facilities. For such a first assessment program, the FEIR offered sufficient information to permit a reasonable choice of potential project alternatives. (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 573.)

■ We further conclude that the County was not required to make findings regarding the feasibility of the stated alternatives. CEQA does not require the responsible agency to consider the feasibility of environmentally superior project alternatives identified in the EIR if described mitigation measures will reduce environmental impacts to acceptable levels. (*Laurel Heights, supra,* 47 Cal.3d at p. 402; *Laurel Hills Homeowners Assn.* v. *City Council* (1978) 83 Cal.App.3d 515, 521 [147 Cal.Rptr. 842].) An EIR must only consider a reasonable range of project alternatives and mitigation measures. (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d at p. 566; *Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at p. 731.) Respondent's FEIR complied with CEQA by discussing project alternatives and including findings that adopted mitigation measures would reduce anticipated environmental impacts to acceptable levels. (Cf. *Citizens for Quality Growth* v. *City of Mt. Shasta, supra,* 198 Cal.App.3d at p. 445.)

### D. *Statement of Overriding Considerations*

■ For the same reason, we reject appellant's contention that the County was obligated under CEQA to include in the FEIR a statement of overriding considerations. According to CEQA Guidelines, section 15093, subdivision (b), a statement of overriding considerations must be provided "[w]here the decision of the public agency allows the occurrence of significant effects which are identified in the final EIR but are not at least

substantially mitigated." (See also § 21081, subd. (c).)[12] The adoption of the Plan did not result in significant unmitigated environmental impacts. Therefore, no statement of overriding considerations was necessary in the FEIR. (*Laurel Hills Homeowners Assn.* v. *City Council, supra,* 83 Cal.App.3d at p. 521.)

### III. *Adoption of a Mitigation Monitoring Program*

Next, appellant argues that respondent failed to adopt an adequate mitigation monitoring program as CEQA demands in section 21081.6, which provides: "When making the findings required by subdivision (a) of Section 21081 . . . the public agency shall adopt a reporting or monitoring program for the changes to the project which it has adopted or made a condition of project approval in order to mitigate or avoid significant effects on the environment. The reporting or monitoring program shall be designed to ensure compliance during project implementation. . . ." Appellant maintains that respondent violated section 21081.6 in three ways: 1) by failing to "set forth a current program to monitor or report on each mitigation measure or alternative"; 2) by deferring development of monitoring or reporting programs for many of the cited mitigation measures and alternatives; and 3) by omitting "monitoring or reporting programs to ensure compliance during project implementation with each and every mitigation measure or alternative."

We conclude that respondent has implemented a mitigation monitoring program which meets CEQA requirements for the project adopted by the Plan. The adequacy of a mitigation monitoring program, like a description of mitigation measures and project alternatives, must be assessed in accordance with the "rule of reason," which requires "what is reasonably feasible." (*Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at p. 733; *Bowman* v. *City of Petaluma, supra,* 185 Cal.App.3d at pp. 1083-1084.) Without approval of a particular site or facility, most identified mitigation measures are incapable of being presently monitored or reported, except to the extent of being included in the policies,

[12]The Guidelines also prohibit approval of a project "for which an EIR was prepared unless the agency has '(A) Eliminated or substantially lessened all significant effects on the environment where feasible . . . , and [¶] (B) Determined that any remaining significant effects on the environment found to be unavoidable . . . are acceptable due to overriding concerns . . . .' " (*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 197 Cal.App.3d at p. 1182; Guidelines, § 15092.) Thus, "[i]f an agency approves a project in spite of identified adverse environmental impacts, it must explain, in written findings, that mitigation measures or environmentally sounder alternatives were not feasible, and that overriding considerations justify the project's approval. (Pub. Resources Code, § 21081; Guidelines, §§ 15091, 15093.)" (*Towards Responsibility in Planning* v. *City Council, supra,* 200 Cal.App.3d at p. 683.)

guidelines and siting criteria stated in the Plan, which will be considered in any future facilities siting decisions. Under the Plan, the County has committed to following all CEQA, Tanner Act and other applicable requirements for management and disposal of hazardous waste. The Plan provides a description of federal, state and local agencies which are either currently involved in monitoring and reporting practices or will participate in implementation of future projects. We agree with the trial court that under the circumstances the Plan complies with section 21081.6.

## IV. *Sufficiency of Evidence to Support the Findings*

Appellant further challenges the substance of the FEIR by arguing that inadequate mitigation measures and alternatives are stated to alleviate identified environmental effects. Appellant submits that the mitigation measures stated in the FEIR are vague, do not in fact mitigate the identified impacts—at least not to the required level of insignificance—and are either inconsistent or were not expressly adopted. Appellant further claims that an inadequate range of alternatives is discussed in the FEIR.

Our review of the FEIR findings is constrained by the substantial evidence rule. Our role is not to determine the correctness of the findings on mitigation of environmental effects, but only to assess "whether they are supported by substantial evidence . . . ." (*Laurel Heights, supra,* 47 Cal.3d at p. 407.) We must "consider the evidence as a whole"; that a discussion of mitigation measures is "imperfect in various particulars does not necessarily mean it is inadequate." (*Id.* at p. 408.) This court "does not pass upon the correctness of an EIR's environmental conclusions"; our role is merely to "determine whether the EIR is sufficient as an informational document. [Citations.]" (*Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at p. 711.)

Any vagueness or perceived inconsistency in the mitigation measures described in the FEIR is, we find, inherent in the discussion of general, countywide impacts in a planning program which has not approved a particular site or facility for development. Thus, many specific mitigation measures can only be "recommended" until a specific facility is proposed. The generic description of mitigation measures and alternatives is, in our view, appropriate to the present, preliminary status of the hazardous waste management and disposal program represented by the Plan. We further find no inconsistencies in the statement of mitigation measures, other than those necessarily caused by the lack of site-specific decisions and the speculative nature of any possible future projects. The general discussion of mitigation

measures for both industrial and agricultural zones—the latter represented by the Montezuma Hills area—does not indicate inconsistency of approach, but rather is a product of respondent's commendable effort to deal with both the primary and secondary effects of the Plan. Upon review of the entire FEIR—including each of the stated resource categories—we conclude that the findings are supported by substantial evidence. (*Towards Responsibility in Planning* v. *City Council, supra*, 200 Cal.App.3d at p. 684.) A broader discussion and implementation of mitigation measures and alternatives is simply not currently reasonably feasible. (*Sacramento Old City Assn.* v. *City Council, supra*, 229 Cal.App.3d at p. 1032.)

## V. *Consistency With Respondent's General Plan and the Tanner Act*

Next, we consider appellant's contention that designation of the Montezuma Hills area as a potential site for a hazardous waste disposal facility conflicts with the Tanner Act and the County's general plan. DHS guidelines implemented under the Tanner Act indicate a preference for location of facilities in industrial rather than rural areas, and state that hazardous waste management plans "should be consistent with" existing local plans. Montezuma Hills is included within the agricultural lands designation in respondent's general plan. Therefore, complains appellant, the conclusion in the Plan that Montezuma Hills meets the siting criteria adopted from the Tanner Act Guidelines is "unsupported by the record" and violates respondent's general plan. The trial court determined that the Plan is not inconsistent with the general plan, and we cannot disturb that finding absent a showing of abuse of discretion. (*Fund for Environmental Defense* v. *County of Orange* (1988) 204 Cal.App.3d 1538, 1555 [252 Cal.Rptr. 79]; *No Oil, Inc.* v. *City of Los Angeles, supra*, 196 Cal.App.3d at p. 243.)

We reiterate that the Plan adopts siting criteria and designates general areas within the County which potentially meet those criteria; it does not specify that Montezuma Hills, or any other particular location, will be the site of a hazardous waste facility. Zoning regulations are considered as an applicable criterion. It is noted in the Plan that facilities may be located in rural areas, "but not those designated as Prime Agriculture . . . as defined in adopted general, regional or state plans."[13] The Plan also states that general plan zoning and land use designations in effect at the time an application for a facility is received "will be applicable in determining siting consistency," and contemplates possible rezoning of agricultural zone districts to special industrial zones. The Tanner Act guidelines and respondent's general plan allow for amendment of existing plans to accommodate waste facilities. A

---

[13]Montezuma Hills is not designated as a prime agricultural area.

commitment is made in the Plan to consistency with respondent's general plan and zoning ordinance, by appropriate local government action if necessary, upon approval of the Plan by the DHS. Consequently, the siting criteria are consistent with the general plan. Any future facility, wherever located, must also be consistent with the general plan. Accordingly, no fatal variance between respondent's action and the general plan or the Tanner Act has been demonstrated.

Appellant's final contention is that the trial court erred by dismissing, sua sponte, the causes of action against the DHS. Appellant complains that dismissal of the severable causes of action against the DHS was erroneous absent demurrer or motion by that party. We find upon review of the record that the trial court did not dismiss appellant's action against the DHS on procedural grounds, but rather denied the relief requested as part of the substantive ruling in the case.[14] Upon a finding by the trial court that the FEIR was not defective, the causes of action against the DHS for equitable relief were rendered moot and were, therefore, properly dismissed. (*Steelgard, Inc.* v. *Jannsen* (1985) 171 Cal.App.3d 79, 83 [217 Cal.Rptr. 152]; *City of Los Angeles* v. *County of Los Angeles* (1983) 147 Cal.App.3d 952, 958-959 [195 Cal.Rptr. 465].) Since we have sustained the trial court's determination that no revisions in the FEIR are necessary, we accordingly affirm the judgment in favor of the DHS.

The judgment is affirmed in its entirety.

Strankman, P. J., and Dossee, J., concurred.

---

[14]Appellant's claims against the DHS were included to ensure that the DHS reviews any amendments to the Plan necessitated by this action.