[No. F023638. Fifth Dist. Aug. 8, 1996.]

STANISLAUS NATURAL HERITAGE PROJECT et al., Plaintiffs and Appellants, v.
COUNTY OF STANISLAUS, Defendant and Respondent;
DIABLO GRANDE LIMITED PARTNERSHIP, Real Party in Interest and Respondent.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication except as to parts II and III.*

**COUNSEL**

Brandt-Hawley & Zoia, Susan Brandt-Hawley and Rose M. Zoia for Plaintiffs and Appellants.

Shute, Mihaly & Weinberger, Mark I. Weinberger and Tamara S. Galanter as Amici Curiae on behalf of Plaintiffs and Appellants.

Michael H. Krausnick, County Counsel, and E. Vernon Seeley, Assistant County Counsel, for Defendant and Respondent.

Meyers, Nave, Riback, Silver & Wilson, Steven R. Meyers, Andrea J. Saltzman, Rick W. Jarvis, Normoyle & Newman, Russell A. Newman and George A. Petrulakis for Real Party in Interest and Respondent.

## OPINION

**ARDAIZ, P. J.**—The "tiering" provisions (Pub. Resources Code, §§ 21068.5, 21093, 21094—see fn. 5, *post*) of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq., or CEQA) enable a public agency to avoid, under some circumstances, having to undertake a repetitious analysis of significant environmental effects of a project when those effects have previously been addressed in an earlier environmental impact report (EIR). In the case before us a public agency approved an environmental impact report for a project calling for the creation of a 29,500-acre, 5,000-residential-unit destination resort and residential community without an on-site water source, but deferred any analysis of significant environmental effects of supplying that water with the understanding that any such effects would be addressed in a later EIR to be prepared after the project was approved. In the published portion of this opinion, we hold that the tiering provisions of CEQA do not exempt a public agency from the Public Resources Code section 21100, subdivision (b)(1) requirement that an EIR shall include a detailed statement setting forth "[a]ll significant effects on the environment of the proposed project," and that under the facts of the present case the superior court erred in upholding the approval of an EIR which deferred any consideration of any significant environmental effects of supplying water to the new community.

### INTRODUCTION

In 1993 respondent County of Stanislaus (County) certified an EIR for a proposed specific plan (the Diablo Grande Specific Plan, or plan) submitted by respondent Diablo Grande Limited Partnership (Diablo Grande) and calling for the creation of a 29,500-acre destination resort and residential community in southwest Stanislaus County. The resort community (the project) was to include scenic open spaces, a wilderness conservation area, six golf courses, swim and tennis facilities, a hotel and executive conference center, a winery, vineyards, a research campus, municipal facilities, a "town center," shops and offices, and five "villages" containing a total of 5,000 residential units.

Certain portions of the project area had been restricted to agricultural use in accordance with so-called "Williamson Act contracts" (see Gov. Code,

§ 51200 et seq.) between the property owners and the County. Under certain circumstances, such a contract can be canceled by a county at the request of a property owner. In this case the County canceled a portion of a Williamson Act contract so that the project could be developed.

After the County certified the EIR and canceled the Williamson Act contract, appellants brought a petition for writ of mandate asking the superior court to set aside the County's certification of the EIR and the County's cancellation of the Williamson Act contract.[1] The court denied the petition and entered judgment in favor of the County.

## APPELLANTS' CONTENTIONS

Appellants' primary contention on this appeal is that the EIR is legally inadequate because it does not "address the procurement and impacts of a permanent water supply."

Second, appellants argue that the County's cancellation of the Williamson Act contract violated that act in several respects, including a violation of a purported requirement that such contracts may be canceled only in "emergency" situations.

Third, appellants raise several conclusory arguments that the superior court erred in failing to find other violations of CEQA and of the California Endangered Species Act (CESA). With regard to CEQA, appellants contend that the EIR is inadequate because it fails to adequately address impacts on wildlife, vegetation and air quality. Appellants further contend that the court erred in failing to find that the EIR should have been recirculated for further public review as a result of comments submitted during the public comment period. With regard to CESA, appellants appear to argue that the County's adoption of the Diablo Grande Specific Plan constituted the "take" of an endangered and threatened species, the San Joaquin kit fox.

In part I of this opinion we will address appellants' primary argument, namely that the EIR is legally deficient because it fails to "address the procurement and impacts of a permanent water supply." In an unpublished portion of this opinion we will address appellants' contention that the County's violation of the Williamson Act contract was unlawful. In another unpublished portion we will turn to appellants' remaining arguments.

---

[1]Appellants are petitioners Stanislaus Natural Heritage Project, Sierra Club, and Ecology Action Educational Institute.

FACTS

A. *The Proposed Project*

On January 3,1991, respondent Diablo Grande submitted a formal application to the County for adoption of a specific plan for a 29,500-acre destination resort community. Diablo Grande also submitted applications for approvals of a general plan amendment and a rezoning consistent with the plan and a completed environmental questionnaire.

The draft specific plan was "prepared to meet the requirements contained in section 65450 et seq. of the Government Code."[2] The draft specific plan called for over 18,700 acres of open space, 5,000 residential units of various sizes and types clustered in 5 villages, a hotel and conference center, 6 golf courses, a swim and tennis club, a winery and vineyard, a research campus and certain supporting facilities. It envisioned that development would occur in four overlapping phases over twenty-five years. Phase 1 was to be completed in year 15. Phase 2 would begin in year five and end in year fifteen. Phase 3 would begin in year 10 and end in year 20. Phase 4 would begin in year 15 and end in year 25. Each phase was to cover a different area of the overall plan area and required approval of a "Preliminary Development Plan" (PDP), which would establish the general regulations for development within the PDP area.

The draft specific plan included a PDP for the first 15-year phase of development covering roughly 2,000 acres and the construction of the primary access road. The phase 1 PDP encompassed most of the first village,

---

[2]Government Code section 65450 states: "After the legislative body has adopted a general plan, the planning agency may, or if so directed by the legislative body, shall, prepare specific plans for the systematic implementation of the general plan for all or part of the area covered by the general plan."

Government Code section 65451 states: "(a) A specific plan shall include a text and a diagram or diagrams which specify all of the following in detail:

"(1) The distribution, location, and extent of the uses of land, including open space, within the area covered by the plan.

"(2) The proposed distribution, location, and extent and intensity of major components of public and private transportation, sewage, water, drainage, solid waste disposal, energy, and other essential facilities proposed to be located within the area covered by the plan and needed to support the land uses described in the plan.

"(3) Standards and criteria by which development will proceed, and standards for the conservation, development, and utilization of natural resources, where applicable.

"(4) A program of implementation measures including regulations, programs, public works projects, and financing measures necessary to carry out paragraphs (1), (2), and (3).

"(b) The specific plan shall include a statement of the relationship of the specific plan to the general plan."

2,000 residential units, the hotel and conference center, the swim and tennis club, 2 golf courses and the access roads. A "mini-phase 1" development for the first five years of phase 1 (also referred to as the Five Year Plan) included one golf course and clubhouse, the winery and vineyard, the hotel, a maintenance center, the first phase of the swim and tennis club and two hundred residential units.[3]

The general plan amendment was requested by Diablo Grande to change the land-use designation of the project area in the County's general plan from "agriculture" to designations consistent with the project. Similarly, the rezoning was requested to change the project area zoning to zoning consistent with the project. Diablo Grande also requested that the County cancel a contract which restricted the property within the phase 1 area to agricultural use for property tax purposes pursuant to the Williamson Act.

B. *The Environmental Setting of the Project*

The 29,500-acre project area, all of which is owned by Diablo Grande, is located in the foothills of the Diablo Range. The Diablo Range forms the western rim of the San Joaquin Valley and is in the southwestern area of the County. The area consists of gently sloping to steep ridges, vegetated primarily with nonnative grasses, native trees (dominated by blue oak) and brush. There are many animal and plant species present or potentially present in the project area, including some of "special status." Portions of the area have been identified as potential habitat for the San Joaquin kit fox (considered an endangered species) but no kit fox have been observed in the area. The access roads, however, traverse kit fox habitat.

The project area is generally dry although there are some riparian habitats, stemming from intermittent creeks, stock ponds and springs. The area does not contain enough on-site sources of water to support the project and, as the draft specific plan stated, "off-site water must be obtained for both residential and commercial purposes."

The project area is now being and has been used for years as rangeland for livestock. Less than 1 percent of the area (approximately 200 acres, located in the phase 4 and 5 areas) is considered "prime" agricultural land. Given the nature of the soil and the slope and the limited on-site water, the rest of the area is considered "limited base" agricultural land, suited for activities such as grazing. Parts of the area have "little grazing value."

---

[3]Pursuant to an agreement with the California Farm Bureau Federation and as approved by the board, these residential units are no longer part of mini-phase 1 and cannot be built until a long-term water supply has been secured and studied.

The surrounding region, from the Altamont Pass in Alameda County to the southern tip of the Temblor Range in Kern County, is little different in terms of use and biology. There are no cities of any appreciable size. The immediately adjacent properties (51 parcels with 28 owners) were also used for rangeland and also are not considered to be prime agricultural land.

We will present other facts pertinent to this appeal in conjunction with our discussions of the issues to which those facts pertain.

I.

### ADEQUACY OF THE EIR RE WATER SUPPLY

In order to place into a meaningful context appellants' contention of inadequacy of the EIR, we begin with an overview of the CEQA review process and of CEQA's requirement that an EIR address the significant impacts of a proposed project. We then restate the law pertaining to the standard by which this court undertakes judicial review of the superior court's determination of CEQA compliance. We then turn to the core issue before us—whether the superior court erred in determining that the EIR's treatment of significant environmental effects of supplying water to the proposed project was legally adequate.

### A. The CEQA Review Process

In *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112 [26 Cal.Rptr.2d 231, 864 P.2d 502] (also known as *Laurel Heights II* so as to distinguish it from *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376 [253 Cal.Rptr. 426, 764 P.2d 278], or *Laurel Heights I*), the California Supreme Court provided the following overview of the CEQA review process.

"We have repeatedly recognized that the EIR is the 'heart of CEQA.' [Citations.] 'Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR "protects not only the environment but also informed self-government." [Citation.]' [Citation.] To this end, public participation is an 'essential part of the CEQA process.' [Citations.]

"With certain limited exceptions, a public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment.' [Citations.] ' "Significant effect on the environment" means a substantial, or potentially substantial, adverse change in the environment.' [Citation.]

"When an EIR is required, the lead agency initially prepares a draft EIR. Once the draft EIR is completed, a comment period is provided for the public and interested agencies. [Citations.] Public hearings to discuss the draft EIR are encouraged, but not required. [Citation.] The comment period is generally no shorter than 30 days and no longer than 90 days. [Citations.]

"In the course of preparing a final EIR, the lead agency must evaluate and respond to comments relating to significant environmental issues. [Citations.] In particular, the lead agency must explain in detail its reasons for rejecting suggestions and proceeding with the project despite its environmental effects. [Citation.] 'There must be good faith, reasoned analysis in response [to the comments received]. Conclusory statements unsupported by factual information will not suffice.' [Citation.] Thus, it is plain that the final EIR will almost always contain information not included in the draft EIR.

"The final substantive step in the EIR review process is certification of the final EIR. The lead agency is required to certify that the final EIR has been completed in compliance with CEQA, and that it reviewed and considered the information in the final EIR prior to approving the project. [Citation.] CEQA also requires that, before approving a project, the lead agency 'find either that the project's significant environmental effects identified in the [final] EIR have been avoided or mitigated or that the unmitigated effects are outweighed by the project's benefits. [Citations.]' [Citation.]

"If the lead agency adds 'significant new information' to the EIR subsequent to the close of the public comment period but *prior* to certification of the final EIR, CEQA requires that the lead agency provide a new public comment period. [Citation.]

"The statutory scheme also provides for an additional public comment period *after* the certification of a final EIR if: (1) 'substantial changes in the project' are made; (2) 'substantial changes' occur regarding the circumstances under which the project is being undertaken; or (3) 'new information, which was not known and could not have been known,' when the EIR was certified, becomes available. [Citations.] The Guidelines in turn generally define 'new information' as information which shows that the project will have new or more severe 'significant effects' on the environment not disclosed in the prior EIR. [Citation.] A 'significant effect' is further defined in the Guidelines as a 'substantial, or potentially substantial, adverse change.' [Citation.]" (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 6 Cal.4th at pp. 1123-1126, fns. omitted.) An EIR must address a proposed project's "significant effect on the environment." (Pub. Resources Code, § 21100, subd. (b).) See also Guidelines (Cal.

Code Regs., tit. 14, § 15000 et seq.) section 15126, subdivision (a) (the EIR "shall identify and focus on the significant environmental effects of the proposed project").

## B. *Judicial Review*

In *Gentry* v. *City of Murrieta* (1995) 36 Cal.App.4th 1359 [43 Cal.Rptr.2d 170], the court summarized the law pertaining to judicial review of agency determinations under CEQA. The court stated:

" 'In an action to set aside an agency's determination under [CEQA], the appropriate standard of review is determined by the nature of the proceeding below. . . . [S]ection 21168 "establishes the standard of review in administrative mandamus proceedings" under Code of Civil Procedure section 1094.5, while section 21168.5 "governs traditional mandamus actions" under Code of Civil Procedure section 1085. [Citation.] The former section applies to proceedings normally termed "quasi-adjudicative," "in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency . . . ." [Citations.] The latter section applies to all other actions taken pursuant to CEQA and generally encompasses "quasi-legislative" decisions made by a public agency. [Citations.]' [Citations.]

"The distinction, however, is rarely significant. In either case, the issue before the trial court is whether the agency abused its discretion. Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence. [Citations.]

" '[I]n undertaking judicial review pursuant to Sections 21168 and 21168.5, courts shall continue to follow the established principle that there is no presumption that error is prejudicial.' [Citation.] However, 'non-compliance with the information disclosure provisions of [CEQA] which precludes relevant information from being presented to the public agency, or noncompliance with substantive requirements of [CEQA], may constitute a prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.' [Citation.]

■ "On appeal, the appellate court's 'task . . . is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law.' [Citation.] The appellate court reviews the administrative record independently; the trial

court's conclusions are not binding on it. [Citations.]" (*Gentry* v. *City of Murrieta, supra*, 36 Cal.App.4th at pp. 1374-1376.)

The standard by which an EIR's analysis of a significant environmental impact is tested is set forth in Guidelines section 15151, which states: "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts. The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (See also *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584 [122 Cal.Rptr. 100]; *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929 [231 Cal.Rptr. 748, 727 P.2d 1029]; *Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852 [226 Cal.Rptr. 575].)[4]

█ A reviewing court does " 'not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' " (*Laurel Heights I, supra*, 47 Cal.3d at p. 392; *Barthelemy* v. *Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1617 [45 Cal.Rptr.2d 688]; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396]; *Atherton* v. *Board of Supervisors* (1983) 146 Cal.App.3d 346, 350 [194 Cal.Rptr. 203]; *Christward Ministry* v. *County of San Diego* (1993) 13 Cal.App.4th 31, 40 [16 Cal.Rptr.2d 435].) *Laurel Heights I* further states:

---

[4]Public Resources Code section 21083 authorizes the state's Office of Planning and Research to prepare, and the Secretary of the Resources Agency to adopt, "guidelines for the implementation of" CEQA by public agencies. These Guidelines are found at California Code of Regulations, title 14, section 15000 et seq., and section 15000 states that the Guidelines "are binding on all public agencies in California." Our California Supreme Court has stated on more than one occasion that " '[a]t a minimum, . . . courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA.' " (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564, fn. 3 [276 Cal.Rptr. 410, 801 P.2d 1161]; *Laurel Heights I, supra*, 47 Cal.3d at p. 391, fn. 2; *Laurel Heights II*, 6 Cal.4th at p. 1123, fn. 4; in accord, see also *Black Property Owners Assn.* v. *City of Berkeley* (1994) 22 Cal.App.4th 974, pp. 983-984, fn. 6 [28 Cal.Rptr.2d 305]; *Gentry* v. *City of Murrieta, supra*, 36 Cal.App.4th at p. 1371, fn. 2; *San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus* (1996) 42 Cal.App.4th 608, 614, fn. 2 [49 Cal.Rptr.2d 494]; and *Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351, 368, fn. 7 [7 Cal.Rptr.2d 307].)

"This standard of review is consistent with the requirement that the agency's approval of an EIR 'shall be supported by substantial evidence in the record.' [Citation.] In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.' [Citations.] The Guidelines define 'substantial evidence' as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.]

"A court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.] A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]" (*Laurel Heights I, supra*, 47 Cal.3d at pp. 392-393; in accord, see *Western States Petroleum Assn.* v. *Superior* Court (1995) 9 Cal.4th 559, 573-574 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; see also Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1996) §§ 12.3 through 12.8, pp. 459 to 468.1.)

C. *The EIR Was Inadequate*

 The EIR in the present case stated in part: "The project's water supply system will involve any one or a number of the following: offsite groundwater, water purchases and exchanges, participation in water conservation projects with other water districts in exchange for water saved; utilization of wastewater effluent, both onsite and acquired offsite; development of groundwater storage facilities in Madera County; utilization of the California Aqueduct and Delta-Mendota Canal for exchange deliveries; and playing an active role in the existing trading network among California water districts south of the Delta."

The EIR also pointed out that the completed project would require approximately 13,000 acre-feet per year of water, or approximately 11,500,000 gallons per day. Phase 1, which would include the golf course and clubhouse, the winery, 40 acres of vineyards, 200 single-family residential units,

and the swim and tennis center, would itself require 5,000 acre-feet of water per year. The first five years of phase 1 (the so-called mini-phase 1) would itself require one thousand two hundred acre-feet per year.

Among the "significant unavoidable impacts" listed in the EIR was the following: "The project would require the provision of approximately 12,880 acre-feet of water per year at buildout from an off-site source for domestic, irrigation, and for light industrial uses. A firm water supply has not yet been established beyond the first five years of development, although the applicant is pursuing several sources, and a water district has been created. *Until such a source is established, this is considered a significant impact.* Upon establishment of such a source, off-site unmitigated impacts may occur from the transfer and use of the water." (Italics added.)

The EIR attempted to deal with this "significant unavoidable impact" by including the following so-called "mitigation measure": "Because long-term water supplies beyond the five-year buildout have not been assured, development requiring over 1,200 acre-feet per year of water shall not be permitted unless the applicant can show to the County's satisfaction that adequate water supplies have been made available, and that environmental impacts of those sources have been studied and mitigated per CEQA requirements."

The EIR also stated that "because adequate water supplies for the project at full buildout have not been secured, provision of those supplies could result in potentially significant impacts" and that "[a]dditional environmental review of further water acquisition projects will be required as part of the water acquisition process or as part of further detailed project-level review for future phases of development."

The County in essence approved an EIR for a 25-year project when water for the project had not been assured beyond the first 5 years of the 15-year first phase of the project. The County knew neither the source of the water the project would use beyond the first five years, nor what significant environmental effects might be expected when the as yet unknown water source (or sources) is ultimately used.

In our view, the County's approval of the project under these circumstances defeated a fundamental purpose of CEQA: to "inform the public and responsible officials of the environmental consequences of their decisions before they are made." (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1123; *Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 564.) The CEQA EIR process "protects not only the environment but also informed self-government." (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1123;

*Citizens of Goleta Valley, supra,* 52 Cal.3d at p. 564; *Laurel Heights I, supra,* 47 Cal.3d at p. 392.) See also Guidelines, California Code of Regulations, title 14, section 15002, subdivision (a)(1), which points out that one of the "basic purposes" of CEQA is to "[i]nform governmental decision-makers and the public about the potential, significant environmental effects of proposed activities."

Similarly, numerous cases have stated that a purpose of CEQA is "to compel government at all levels to make decisions with environmental consequences in mind." (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Laurel Heights I, supra,* 47 Cal.3d at p. 393; *Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 711 [270 Cal.Rptr. 650].) This informational purpose of CEQA is crucial to informed decisionmaking. CEQA "does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." (*Bozung, supra,* 13 Cal.3d at p. 283; *Laurel Heights I, supra,* 47 Cal.3d at p. 393; *Kings County, supra,* 221 Cal.App.3d at p. 711; *A Local & Regional Monitor* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1809 [16 Cal.Rptr.2d 358].) CEQA does, however, guarantee or at least attempt to assure that the environmental consequences of a government decision on whether to approve a project will be considered before, not after, that decision is made.

The case of *Santiago County Water Dist.* v. *County of Orange* (1981) 118 Cal.App.3d 818 [173 Cal.Rptr. 602] is remarkably similar to the present case. In *Santiago* the County of Orange approved an EIR which had been prepared in order to examine the consequences of permitting a mining company to operate a sand and gravel mining operation. The EIR contained no information demonstrating that any water supplier had agreed to provide water to the project and no information about what the environmental effects would be even if the local water district (or any other supplier) could and would supply water for the project. The County of Orange found that the EIR was complete and adequate, and approved a site permit for the sand and gravel project. The approval of the site permit was made subject to certain conditions. One of the conditions was that " '[p]rior to commencement of mining operations or the issuance of a sand and gravel extraction permit, the operator shall establish an adequate water supply and appurtenant system to supply the water needs of the mining operation, processing plant and reclamation irrigation.' " (118 Cal.App.3d at p. 828.) The superior court denied a petition for writ of mandate challenging the approval of the EIR. The Court of Appeal reversed and pointed out that an EIR " 'should be prepared with a sufficient degree of analysis to provide decision makers with information which enables them to make a decision which intelligently takes account

of environmental consequences.' " (118 Cal.App.3d at p. 831; see also Guidelines, Cal. Code Regs., tit. 14, § 15151.)

The EIR in *Santiago* failed to include "facts from which to evaluate the pros and cons of supplying the amount of water that the mine will need." (118 Cal.App.3d at p. 829.) In *San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus* (1994) 27 Cal.App.4th 713 [32 Cal.Rptr.2d 704], this court relied in part on *Santiago* to conclude that an EIR for a 900-home residential development was inadequate because it failed to contain any analysis of the environmental effects of the sewer expansion which was part of the project but which had simply been omitted from the project description. We stated that the sewer expansion was a crucial element of the development project, but that "[h]ere, as in *Santiago*, the EIR ignored the environmental effects of the excluded element, thereby frustrating a 'core goal[] of CEQA.' " (*Id.* at p. 732.)

■ Respondent Diablo Grande candidly concedes that "there is no analysis of the potential impacts of the eventual long-term supply" of water. Respondents attempt to justify this omission by relying on the "tiering" provisions of CEQA. As we shall explain, however, a decision to "tier" environmental review does not excuse a governmental entity from complying with CEQA's mandate to prepare, or cause to be prepared, an environmental impact report on any project that may have a significant effect on the environment, with that report to include a detailed statement setting forth "[a]ll significant effects on the environment of the proposed project." (Pub. Resources Code, § 21100.)

Public Resources Code sections 21068.5, 21093 and 21094 govern the use of "tiered" EIR's.[5] Those statutes appear to evidence a legislative intent to free a lead agency from having to reinvent the wheel, so to speak, each time

---

[5]Public Resources Code section 21068.5 states: " 'Tiering' or 'tier' means the coverage of general matters and environmental effects in an environmental impact report prepared for a policy, plan, program or ordinance followed by narrower or site-specific environmental impact reports which incorporate by reference the discussion in any prior environmental impact report and which concentrate on the environmental effects which (a) are capable of being mitigated, or (b) were not analyzed as significant effects on the environment in the prior environmental impact report."

Public Resources Code section 21093 states: "(a) The Legislature finds and declares that tiering of environmental impact reports will promote construction of needed housing and other development projects by (1) streamlining regulatory procedures, (2) avoiding repetitive discussions of the same issues in successive environmental impact reports, and (3) ensuring that environmental impact reports prepared for later projects which are consistent with a previously approved policy, plan, program, or ordinance concentrate upon environmental effects which may be mitigated or avoided in connection with the decision on each later project. The Legislature further finds and declares that tiering is appropriate when it helps a

an EIR is prepared on one of a series of projects when some of the significant environmental effects of those projects could be analyzed once at the outset. The authors of Practice Under the California Environmental Quality Act (Cont.Ed.Bar 1995) state at section 11.4 on page 432 that "[t]he tiering of EIRs allows agencies to evaluate broad environmental issues, to respond to those issues in an EIR prepared at the planning stage, and to provide detailed examination of specific issues in EIRs on later development projects that are consistent with or implement the approved plan." Consider, for example, a series of five new downtown office building construction projects. Each might be expected to generate significant additional automobile traffic. Rather than present a new traffic impact analysis in each of five EIR's, a "first tier" EIR might be used to analyze traffic impacts and other common environmental impacts expected to result from the five projects. The later EIR's on the individual projects would then "refer to" the first-tier EIR for analysis of traffic impacts. (Pub. Resources Code, § 21094, subd. (e).)

---

public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports.

"(b) To achieve this purpose, environmental impact reports shall be tiered whenever feasible, as determined by the lead agency."

Public Resources Code section 21094 states: "(a) Where a prior environmental impact report has been prepared and certified for a program, plan, policy, or ordinance, the lead agency for a later project that meets the requirements of this section shall examine significant effects of the later project upon the environment by using a tiered environmental impact report, except that the report on the later project need not examine those effects which the lead agency determines were either (1) mitigated or avoided pursuant to subdivision (a) of Section 21081 as a result of the prior environmental impact report, or (2) examined at a sufficient level of detail in the prior environmental impact report to enable those effects to be mitigated or avoided by site specific revisions, the imposition of conditions, or by other means in connection with the approval of the later project.

"(b) This section applies only to a later project which the lead agency determines (1) is consistent with the program, plan, policy, or ordinance for which an environmental impact report has been prepared and certified, (2) is consistent with applicable local land use plans and zoning of the city, county, or city and county in which the later project would be located, and (3) is not subject to Section 21166.

"(c) For purposes of compliance with this section, an initial study shall be prepared to assist the lead agency in making the determinations required by this section. The initial study shall analyze whether the later project may cause significant effects on the environment that were not examined in the prior environmental impact report.

"(d) All public agencies which propose to carry out or approve the later project may utilize the prior environmental impact report and the environmental impact report on the later project to fulfill the requirements of Section 21081.

"(e) When tiering is used pursuant to this section, an environmental impact report prepared for a later project shall refer to the prior environmental impact report and state where a copy of the prior environmental impact report may be examined."

Respondents argue that because they intend to undertake site-specific environmental review of each of the four "phases" of development, they can properly defer analysis of the environmental impacts of supplying water to the project until the actual source of that supply is selected sometime in the future. But "tiering" is not a device for deferring the identification of significant environmental impacts that the adoption of a specific plan can be expected to cause. The County in this case could not make an informed decision on whether to adopt the Diablo Grande Specific Plan without being informed, to some reasonable degree, of the environmental consequences of supplying water to a 5,000-residential-unit development which has no on-site water source.[6] Indeed, the environmental consequences of supplying water to this project would appear to be one of the most fundamental and general "general matters" to be addressed in a first-tier EIR. (See Pub. Resources Code, § 21068.5.)

Respondents rely on *Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729 [22 Cal.Rptr.2d 618] to attempt to justify their deferral of an identification of environmental impacts to be caused by providing water to the project. In our view *Al Larson* is distinguishable. In that case the Board of Commissioners of the City of Long Beach prepared a first-tier EIR in connection with approval of an amendment to a "port master plan." (*Id.* at p. 736.) The amendment was described in the opinion as a "five-year plan of the Board to increase Port cargo handling capacity in the short-term through the means of six 'anticipated' projects . . . ." (*Id.* at p. 743.) Each of the six "anticipated" projects was to itself undergo CEQA review. The *Al Larson* court rejected a contention that the first-tier EIR was legally inadequate for failing to discuss alternative sites for each of the six "anticipated" projects. The court stated that the project which was the subject of the first-tier EIR was not "the 'approval' of any of the 'anticipated' projects or their locations" but rather was instead the aforementioned "five-year plan of the Board to increase Port cargo handling capacity in the short-term through the means of the six 'anticipated' projects . . . ." (*Ibid.*) The court stated: "Without question, alternatives to each of the six 'anticipated' projects had to be considered at some point. The real issue is when. The 'determination of the earliest feasible time to [prepare an EIR] is to be made initially by the agency itself, which decision must be respected in the absence of manifest abuse.' [Citation.]" (18 Cal.App.4th at p. 743.) In the present case, however, the specific plan calls for the construction of 5,000 residential units and other water-using improvements (e.g., golf courses). No matter what subsequent environmental review might take place, and no matter what additional mitigation measures might be adopted to ameliorate adverse environmental impacts on each of the four "phases" of

---

[6]See Guidelines, California Code of Regulations, title 14, section 15151, quoted in the text of subpart B of part I, *ante.*

planned development, the project was going to need water from some source or sources. To defer any analysis whatsoever of the impacts of supplying water to this project until after the adoption of the specific plan calling for the project to be built would appear to be putting the cart before the horse.

Some of the difficulty in applying the tiering concept appears to result from the fact that an EIR is prepared for a "project" (Pub. Resources Code, §§ 21100, 21065) and that when tiering is used, there appear to be two or more "projects." Public Resources Code sections 21068.5 and 21093 refer to a "policy, plan, program, or ordinance" for which an EIR has been prepared. (See also Pub. Resources Code, § 21094 [program, plan, policy, or ordinance] and Guidelines, Cal. Code Regs., tit. 14, §§ 15385 [program, plan, or policy] and § 15168 [program].)[7] A first-tier EIR or "program EIR" (see Guidelines, § 15168) is then utilized in connection with an EIR on a "later project" (Pub. Resources Code, § 21094, subd. (d)). Although Public

---

[7]Guidelines section 15385 states: " 'Tiering' refers to the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs or ultimately site-specific EIRs incorporating by reference the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared. Tiering is appropriate when the sequence of EIRs is:

"(a) From a general plan, policy, or program EIR to a program, plan, or policy EIR of lesser scope or to a site-specific EIR.

"(b) From an EIR on a specific action at an early stage to a subsequent EIR or a supplement to an EIR at a later stage. Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe."

Guidelines section 15168 states: "(a) General. A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either:

"(1) Geographically, [¶] (2) As logical parts in the chain of contemplated actions, [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways.

"(b) Advantages. Use of a program EIR can provide the following advantages. The program EIR can:

"(1) Provide an occasion for a more exhaustive consideration of effects and alternatives than would be practical in an EIR on an individual action, [¶] (2) Ensure consideration of cumulative impacts that might be slighted in a case-by-case analysis, [¶] (3) Avoid duplicative reconsideration of basic policy considerations, [¶] (4) Allow the lead agency to consider broad policy alternatives and program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts, and [¶] (5) Allow reduction in paperwork.

"(c) Use With Later Activities. Subsequent activities in the program must be examined in the light of the program EIR to determine whether an additional environmental document must be prepared.

"(1) If a later activity would have effects that were not examined in the program EIR, a new initial study would need to be prepared leading to either an EIR or a negative declaration. [¶] (2) If the agency finds that pursuant to Section 15162, no new effects could occur or no new mitigation measures would be required, the agency can approve the activity as being within

Resources Code sections 21068.5, 21093 and 21094 do not appear to expressly say so, the "program, plan, policy or ordinance" is itself a "project." Section 15168 of the Guidelines appears to acknowledge at least indirectly that a "program" is a "project" by stating that a "program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project . . . ."

It is crucial, however, for a government decision maker to know what the "project" is that the decision maker is approving. Numerous cases have stated that "[o]nly through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance" and that "[a]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d at pp. 192-193; *Santiago County Water Dist.* v. *County of Orange, supra,* 118 Cal.App.3d at p. 830; *San Joaquin Raptor/Wildlife Rescue Center* v. *County of Stanislaus, supra,* 27 Cal.App.4th 713, 732; *Sacramento Old City Assn.* v. *City Council* (1991) 229 Cal.App.3d 1011, 1023 [280 Cal.Rptr. 478].) Respondents assert that the EIR in the present case is both a "program EIR" for the County's adoption of the

the scope of the project covered by the program EIR, and no new environmental document would be required. [¶] (3) An agency shall incorporate feasible mitigation measures and alternatives developed in the program EIR into subsequent actions in the program. [¶] (4) Where the subsequent activities involve site specific operations, the agency should use a written checklist or similar device to document the evaluation of the site and the activity to determine whether the environmental effects of the operation were covered in the program EIR. [¶] (5) A program EIR will be most helpful in dealing with subsequent activities if it deals with the effects of the program as specifically and comprehensively as possible. With a good and detailed analysis of the program, many subsequent activities could be found to be within the scope of the project described in the program EIR, and no further environmental documents would be required.

"(d) Use With Subsequent EIRs and Negative Declarations. A program EIR can be used to simplify the task of preparing environmental documents on later parts of the program. The program EIR can:

"(1) Provide the basis in an initial study for determining whether the later activity may have any significant effects. [¶] (2) Be incorporated by reference to deal with regional influences, secondary effects, cumulative impacts, broad alternatives, and other factors that apply to the program as a whole. [¶] (3) Focus an EIR on a subsequent project to permit discussion solely of new effects which had not been considered before.

"(e) Notice with Later Activities. When a law other than CEQA requires public notice when the agency later proposes to carry out or approve an activity within the program and to rely on the program EIR for CEQA compliance, the notice of the activity shall include a statement that:

"(1) This activity is within the scope of the program approved earlier, and [¶] (2) The program EIR adequately describes the activity for the purposes of CEQA."

Diablo Grande Specific Plan and a "project-level" EIR for phase 1 of that specific plan.

The amendment of a general plan is a "project" within the meaning of CEQA's definition of that term. (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 529-533 [160 Cal.Rptr. 907]; *Black Property Owners Assn.* v. *City of Berkeley, supra*, 22 Cal.App.4th at p. 985; see also Pub. Resources Code, § 21065 and Guidelines, Cal. Code Regs., tit. 14, § 15378, subd. (a)(1).) The County's amendment of its general plan to include the Diablo Grande Specific Plan was therefore itself a "project."[8] Calling it a "program" does not relieve the County from having to address the significant environmental effects of that project. Respondents are therefore incorrect in asserting that the County may (1) deem the environmental effects of adopting the specific plan, whatever those effects may be, to

---

[8]The EIR itself described the "project" as follows:

"D. Technical Project Description

"Introduction

"The proposed project is an amendment to the Stanislaus County General Plan and rezoning to permit development of a planned destination resort and residential community on the site. In addition, the project includes a Phase 1 Preliminary Development Plan for 2,000 acres of the site centered around Oak Flat. [¶] The following project description was summarized from the Draft Specific Plan prepared by Diablo Grande, Inc. in April 1992. The Draft Specific Plan is available for public review at the Stanislaus County Planning Department.

"Description

"The entire 29,500-acre project site is proposed for a General Plan designation of 'Specific Plan'. In addition, all property within the site is proposed to have underlying or combining General Plan designations contained in the Stanislaus County General Plan (Table III.D-A). The site is currently designated Agriculture in the County's General Plan. Zoning on the site is proposed to be changed from A-2-160, General Agriculture District, with two dwellings allowed for every 160 acres, to S-P, 'Specific Plan,' pursuant to Chapter 21.38 of the Stanislaus County Zoning Ordinance. The project would have underlying or combined zone classifications based on districts contained in the Stanislaus County Zoning Ordinance as modified by the Specific Plan (Table III.D-B). [¶] Under the General Plan amendment and rezoning, development of five 'villages' is proposed including recreational, residential, open space, resort, office, commercial, agricultural, and other land uses. Figure III.D-1 is the proposed land use plan. Additional development would occur within the Entry Area between the proposed Village 1 and the eastern boundary of the Diablo Grande Project site. The proposed land uses are summarized in Table III.D-C."

An "Introduction" at the beginning of the EIR described the EIR as purporting to enable the County and the public to "examine the overall effects of the proposed project." The "Introduction" stated in part: "This EIR provides program-level environmental analysis of the Specific Plan as well as project-level analysis of the proposed Phase 1 of development. The program-level analysis enables government decision makers and the public to examine the overall effects of the proposed project and to avoid or reduce adverse environmental impacts. Upon preparation of detailed proposed preliminary development plans within the Specific Plan, future project-specific environmental studies will be provided. The project-level environmental analysis of Phase 1 is to determine the extent of potential impacts associated with the specific proposed land uses and to recommend mitigation measures to offset impacts."

be significant, then (2) approve the specific plan, and then (3) at some later time determine what the significant environmental effects are of the specific plan that has already been approved.[9] The County did not here simply adopt or amend a general plan so as to permit the building of homes and golf courses. The County adopted a specific plan calling for the construction of those facilities and of other particularly described facets of the Diablo Grande Specific Plan.

At oral argument before this court, respondent Diablo Grande emphasized four cases which it contends bolster its view that the EIR in the present case was adequate and that all analysis of any significant environmental effects of supplying water to the proposed project may be deferred to a later time. These are *Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022 [185 Cal.Rptr. 41], *Rio Vista Farm Bureau Center* v. *County of Solano, supra,* 5 Cal.App.4th 351, *Sacramento Old City Assn.* v. *City Council, supra,* 229 Cal.App.3d 1011, and *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664 [188 Cal.Rptr. 233]. In our view, none of these four cases is comparable to the present case and none of them support the view that all analysis of significant environmental effects of supplying water to a 5,000-residential-unit development may properly be deferred until after an EIR for the specific plan for such a development has been approved.

In *Village Laguna, supra,* the Orange County Board of Supervisors approved an EIR for a general plan amendment calling for development of a "new city" in southwest Orange County near Laguna Beach. The EIR discussed various alternatives for the new city, including "plans for the development of 0, 7,500, 10,000, 20,000, and 25,000 dwelling units" in the proposed new city. (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d at p. 1028.) The appellant argued that the EIR was deficient because of a "failure of the EIR to consider as an alternative the development of 'some number' of dwelling units between . . . 10,000 . . . and . . . 20,000 . . . ." (*Ibid.*) The court rejected this argument. It noted that there were "literally thousands of 'reasonable alternatives' to the proposed project." (*Ibid.*) It stated that "the building of 1,000,

---

[9]See also Guidelines, California Code of Regulations, title 14, section 15165, which states: "Where individual projects are, or a phased project is, to be undertaken and where the total undertaking comprises a project with significant environmental effect, the lead agency shall prepare a single program EIR for the ultimate project as described in Section 15168. Where an individual project is a necessary precedent for action on a larger project, or commits the lead agency to a larger project, with significant environmental effect, an EIR must address itself to the scope of the larger project. Where one project is one of several similar projects of a public agency, but is not deemed a part of a larger undertaking or a larger project, the agency may prepare one EIR for all projects, or one for each project, but shall in either case comment upon the cumulative effect."

16,000, 22,500, and 20,001 homes are reasonable alternatives" but that "no one would argue that the EIR is insufficient for failure to describe the 20,001 home alternative." (*Ibid.*) The court then stated: " 'Absolute protection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned.' " (*Id.* at p. 1029.) We fail to see how *Village Laguna* helps respondents' position at all. *Village Laguna* is about whether an EIR's discussion of alternatives was adequate. The issue in the present case is not whether there was an adequate discussion of alternatives, but whether the EIR in this case was somehow excused from the statutory mandate that an EIR "shall include a detailed statement setting forth . . . [a]ll significant effects on the environment of the proposed project." (Pub. Resources Code, § 21100, subd. (b)(1); see also Guidelines, Cal. Code Regs., tit. 14, § 15126, subd. (a).)

In *Rio Vista Farm Bureau Center* v. *County of Solano, supra,* 5 Cal.App.4th 351, the County of Solano certified an EIR for a "hazardous waste management plan." (*Id.* at p. 362.) "The stated purpose of this Plan was to review and analyze existing hazardous waste disposal facilities, . . . and identify 'site selection criteria for new or expanded . . . facilities, to accommodate projected needs.' " (*Id.* at p. 363.) The appellant argued that the EIR was deficient because of the "omission of any description of specific potential future facilities." (*Id.* at p. 371.) The court rejected this argument and stated: "The flaw in appellant's argument is that the Plan makes no commitment to future facilities other than furnishing siting criteria and designating generally acceptable locations. While the Plan suggests that new facilities may be needed by the County, no siting decisions are made; the Plan does not even determine that future facilities will ever be built. Both the Plan and the FEIR consistently state that no actual future sites have been recommended or proposed." (5 Cal.App.4th at p. 371.)

The present project, in contrast, does identify the specific location of each of the five proposed villages, and the timing of the construction of those villages in four separate phases. The project here is not merely a general policy document, but an actual specific plan. (See Gov. Code, § 65451 & fn. 2, *ante.*) The *Rio Vista* court noted that "[t]he Plan does not select or recommend any specific sites for hazardous waste disposal facilities." (5 Cal.App.4th at p. 364.) The project in the present case does designate the specific sites for future development, and describes what structures the future development will consist of. *Rio Vista* also points out, just as we do in this case, that CEQA "requires . . . that an EIR discuss '[t]he significant environmental effects of the proposed project.' " (5 Cal.App.4th at p. 373.)

*Sacramento Old City Assn.* v. *City Council, supra,* 229 Cal.App.3d 1011, involved the adequacy of an EIR for a project "to expand the downtown

Sacramento Convention Center complex (the center) and to construct an office tower at 1325 J Street (the office tower)." (*Id.* at p. 1015.) The issue was whether the EIR adequately analyzed "the potential environmental effects of the parking necessitated by the project." (*Id.* at p. 1019.) The EIR in that case did analyze the project's effect on parking. It included detailed proposals on how to handle the additional parking spaces that would be needed. (See 229 Cal.App.3d at pp. 1019-1023.) The appellants contended that the EIR was inadequate because the EIR did not specify which of the seven different parking mitigation measures discussed in the EIR would actually be adopted. The court rejected this argument and concluded that the EIR sufficiently addressed the project's impacts on parking. By contrast, respondents in the present case flatly contend that they may simply defer any analysis whatsoever of any significant environmental effects which might result from the supplying of water to the project. *Sacramento Old City Assn.* thus does not help respondents.

In *Twain Harte Homeowners Assn.* v. *County of Tuolumne, supra,* 138 Cal.App.3d 664, the challenge was to the adequacy of the EIR for a general plan adopted by the County of Tuolumne. The appellant's arguments in *Twain Harte* did not include any contention that the county had failed to address any significant environmental impacts of the plan, but rather that the EIR's analysis of those impacts was not sufficiently detailed. The court rejected that contention. It concluded that the EIR "may not have been exhaustive but it was an adequate, complete, reasoned analysis, and a good faith effort at full disclosure." (*Id.* at p. 677.) *Twain Harte* does not persuade us that an EIR may simply defer any statement setting forth a significant environmental effect of a proposed project.

Respondents' contention that the EIR is legally sufficient as a "project level" or second-tier EIR for phase 1 of the Diablo Grande Specific Plan is similarly unpersuasive. Phase 1 will last 15 years, but only the water source for the first 5 years (the so-called "mini-phase 1") has been identified and examined. The source of water, and any significant environmental effects of supplying that water, for years six through fifteen of phase 1 were not disclosed in the EIR.

We are not concluding respondent must first find a source of water for the "project" before an EIR will be adequate. We are concluding that an EIR for this project must address the impact of supplying water for the project. It is not mitigation of a significant environmental impact on a project to say that if the impact is not addressed then the project will not be built. The decision not to build may well rest upon the absence of a suitable or adequate water

source. However, the decision to approve the EIR of this project does require recognition that water must be supplied, that it will come from a specific source or one of several possible sources, of what the impact will be if supplied from a particular source or possible sources and if that impact is adverse how it will be addressed. While it might be argued that not building a portion of the project is the ultimate mitigation, it must be borne in mind that the EIR must address the project and assumes the project will be built.

We do not by this opinion place any new burdens on preparers of EIR's. Our opinion today is merely an affirmation of already existing law. "Drafting an EIR . . . necessarily involves some degree of forecasting. While forecasting the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can." (Guidelines, Cal. Code Regs., tit. 14, § 15144.) Because the specific plan here (and also phase 1 of the development) unquestionably and admittedly contemplate the supplying of water to a large development, respondent County must "attempt in good faith to fulfill its obligation under CEQA to provide sufficient meaningful information regarding the types of activity and environmental effects that are reasonably foreseeable" from that supplying of water. (*Laurel Heights I, supra,* 47 Cal.3d at p. 399.)

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV.

DISPOSITION

For the reasons stated in part I of this opinion, the judgment is reversed. Costs to appellants.

Dibiaso, J., and Vartabedian, J., concurred.

A petition for a rehearing was denied Septemaber 6, 1996, and the opinion was modified to read as printed above. The petition of respondent County of Stanislaus for review by the Supreme Court was denied November 13, 1996. Kennard, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 182.