Filed 10/9/15  Castro v. City of Sacramento CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ROBERT CASTRO, JR., et al., | C064091 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34200800012385CUWMGDS) |
| v. | |
| CITY OF SACRAMENTO et al., | |
| Defendants and Respondents; | |
| IA SACRAMENTO HOLDINGS, L.L.C., et al., | |
| Real Parties in Interest and Respondents. | |

This is another chapter in the history of the litigation involving property once occupied by the Southern Pacific and Union Pacific Railroads in the City of Sacramento. As described in greater detail below, the long-vacant railyard property has been the subject of several redevelopment plans and amended redevelopment plans and multiple

1

lawsuits.  The Richards Boulevard Redevelopment Plan (Richards Boulevard Plan), which encompassed the railyards as well as the industrial area surrounding Richards Boulevard, was adopted by the City of Sacramento (City) in 1990.  Thereafter, in 2008, the Richards Boulevard Plan was amended to remove from the project area boundaries 300 acres, reducing its size to 1,068 acres, and to change its name.  The 300 acres removed from the plan, 245 acres of former railyard property along with approximately 60 acres of downtown Sacramento property, became the subject of a new Railyards Redevelopment Plan (Railyards Plan).  The City also approved a land use plan, the Railyards Specific Plan (Specific Plan), limited to the railyards.  The City's review of the Specific Plan environmental impact report (Specific Plan EIR) is the subject of separate litigation.  (*Sacramento Citizens Concerned About the Railyards v. City of Sacramento* (Oct. 7, 2015, C065220 [nonpub. opn.] (*Sacramento Citizens*).)

In this appeal, plaintiffs Robert Castro, Jr., Linda Powers, and Chris Rich (collectively, Castro) challenge the decision of defendants City and the Redevelopment Agency of the City of Sacramento (Agency) to amend the 1990 Richards Boulevard Plan to remove 300 acres from its boundaries and rename it the River District Redevelopment Plan (River District Plan).  Castro also challenges the City's adoption of the new Railyards Plan covering the 300 acres removed from the Richards Boulevard Plan. Castro argues (1) the environmental impact report for the Richards Boulevard Plan amendment and Railyards Plan (Redevelopment EIR) violated CEQA (California Environmental Quality Act; Pub. Resources Code, § 21000 et seq.) by improperly tiering from the Specific Plan EIR, (2) the Agency impermissibly segmented environmental review by certifying the Redevelopment EIR, and (3) the Redevelopment EIR failed to analyze and mitigate toxic air contaminants.  We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

We begin, as all environmental sagas must, with the history leading up to the current imbroglio. The area at the center of this dispute includes over 200 acres of the former Union Pacific Railyards, an area developed in the late 1880's.

**Richards Boulevard Plan**

In 1990 the City adopted the Richards Boulevard Plan for the Richards Boulevard Redevelopment Project Area (Richards Boulevard Project Area), which included the railyards area. However, the City's efforts to develop the railyards area bore no fruit over the next 17 years. The City faced obstacles including lack of infrastructure, environmental contamination, issues of historic preservation, and the need to realign the area's levee system.

Based on these concerns, the City determined it could not develop the railyards area without a separate redevelopment project area limited to just the railyards. This separate project area would free the rest of the Richards Boulevard Project Area from the costs and other development constraints associated with developing the railyards.

### *Amendment of the Richards Boulevard Plan*

In 2007 the Planning Commission of the City of Sacramento (Planning Commission) amended the boundaries of the Richards Boulevard Project Area and the preliminary plan therefor to exclude the railyards area. The amendment changed the title of the Richards Boulevard Plan to the River District Plan and removed from the Richards Boulevard Project Area the 300 acres proposed to be included in the new Railyards Redevelopment Project Area (Railyards Project Area). The River District Plan covers approximately 1,068 acres north of the new Railyards Project Area and consists of warehouse and distribution facilities. The Planning Commission designated the land within the boundaries of the railyards as the new Railyards Project Area.

The Railyards Project Area consists of the 300 acres formerly within the Richards Boulevard Project Area. The Railyards Project Area is located within the Central City

3

Community Plan area of the City of Sacramento. Most of the Railyards Project Area is subject to the Specific Plan, but the boundaries of the 300-acre Railyards Project Area differ from the 244-acre Specific Plan area.[1]

Under the Specific Plan, the 244 acres will become a diverse mixed-use development. The remaining approximately 60 acres of the Railyards Development Plan are not included in the Specific Plan. The 60 acres contain the United States Courthouse, the Sacramento County Jail, the Sacramento County Administration Building, and the Sacramento City Hall.

### EIR for the Railyards Plan

Later in 2007 the Agency released a notice of preparation (NOP) of an EIR to evaluate the environmental impact of the Richards Boulevard Plan amendment and the Railyards Plan. The NOP described the proposed project as an amendment of the Richards Boulevard Plan and the adoption of a new Railyards Plan. It explained that the railyards portion of the Richards Boulevard Project Area would be deleted from the project area and be established as a separate redevelopment project area, the Railyards Project Area. The amendment would change the name of the Richards Boulevard Plan to the River District Plan.

Amendment of the Richards Boulevard Plan would not require an EIR, but the new Railyards Plan would.

---

[1] Defendants and real parties in interest accuse plaintiffs of trying to create confusion between the City's land use approval of the Specific Plan and its EIR, and the Agency's separate and subsequent approval of the redevelopment plans and certification of the Redevelopment EIR. They emphasize that while the Specific Plan covers part of the Railyards Project Area, the Specific Plan and the redevelopment plans are distinct projects, governed by separate statutes, serving different purposes, and covering different geographical areas with potentially different environmental impacts.

**The Specific Plan EIR**

In the summer of 2007 the City released the Specific Plan EIR for public review and comment. The Specific Plan replaced a prior railyards specific plan prepared by the ROMA Design Group and approved by the City in 1994 (the ROMA Plan) and allowed development different from that contemplated by the prior plan. The Specific Plan EIR covers the 244 acres in the Railyards Project Area and the environmental impacts of transforming the railyards property into a diverse mixed-use development that may include up to 2.4 million square feet of office space and approximately 12,500 residential units.

The City certified the Specific Plan EIR in December 2007. Project approvals listed in the Specific Plan included "Approval of a Redevelopment Plan," "Owner Participation Agreement" (OPA), and "Financing Plan."[2]

**The Road to Litigation**

In October 2007 the Agency filed an NOP for the draft Redevelopment EIR and transmitted the NOP to local agencies to solicit comments. In December the City certified completion of the Specific Plan EIR for the 244-acre railyards property.

In January 2008 the Agency filed a notice of availability of the draft Redevelopment EIR and distributed it to various agencies, organizations, and individuals. The draft Redevelopment EIR remained open for comment for 45 days. The Agency received relatively few comments on the draft Redevelopment EIR. The Agency revised

---

[2] An OPA is a contract between a property owner or developer and a redevelopment agency to permit redevelopment of property within a redevelopment project area that is owned by an entity other than the redevelopment agency. (Health & Saf. Code, § 33339.) The master OPA provides a framework for entering into subsequent, project-specific OPA's, including the initial phase infrastructure OPA, which nevertheless stands as an independent document.

the draft Redevelopment EIR and addressed the comments. In April 2008 the Agency released the final Redevelopment EIR.

In May 2008 the Agency certified completion of the Redevelopment EIR, approved the amendment to the Richards Boulevard Plan, approved the Railyards Plan, and adopted an implementation plan for the Railyards Redevelopment Project. The City Council of the City of Sacramento amended the Richards Boulevard Plan and approved the Railyards Plan in May 2008. The Agency also entered into a master OPA and an Initial Phase Infrastructure OPA with the developer of the railyards project.

Castro filed a petition for a writ of mandate, challenging the Agency's certification of the Redevelopment EIR.

**Trial Court Decision**

The trial court denied Castro's petition a for writ of mandate. The court determined that the Specific Plan development project and the Railyards Plan project are separate and independent from each other for the purposes of CEQA. In addition, the court also rejected Castro's contention that the Redevelopment EIR improperly tiered from the Specific Plan EIR. The court found the Redevelopment EIR reasonably responded to Castro's contentions regarding the risks posed by toxic air contaminant (TAC) emissions.

Castro filed a timely notice of appeal.

**DISCUSSION**

**STANDARD OF REVIEW**

The Legislature intended CEQA to be interpreted to afford the fullest possible protection to the environment within the reasonable scope of the statute. The EIR provides the means of achieving this goal. It is an environmental alarm bell, alerting the public and its governmental representatives to environmental changes before they become irreversible. In addition, it provides the public with some assurance that the responsible agency has analyzed and considered the ecological impacts of its action. As

6

a document of accountability, the EIR allows the public to know the basis on which officials approve or reject environmentally significant action.  Such knowledge allows the public to respond to official actions that impact the environment.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390-392 (*Laurel Heights*).)

When considering a challenge to the legal adequacy of an EIR, we presume an agency's decision to certify the EIR is correct, placing the burden of establishing otherwise on the party challenging the EIR.  (*Sierra Club. v. City of Orange* (2008) 163 Cal.App.4th 523, 530 (*Sierra Club*).)  We must determine whether the agency abused its discretion by not proceeding in a manner required by law and whether the decision is supported by substantial evidence.  We do not second-guess the correctness of the EIR's environmental conclusions but consider only its sufficiency as an informational document.  (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.)  We will not set aside an agency's approval of an EIR on the ground that a different conclusion would have been more reasonable or equally compelling.  (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564.)

We review the agency's decision, not that of the trial court.  (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162.)  When considering whether an agency followed the correct procedures, we conduct a de novo review.  However, when reviewing an agency's substantive factual conclusions, we afford the agency greater deference and employ the substantial evidence test.  In reviewing the record for substantial evidence we do not reweigh the evidence.  Instead, we focus on the adequacy, completeness, and good faith effort at full disclosure.  (*Sierra Club*, *supra*, 163 Cal.App.4th at p. 531; *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390.)

**IMPROPER TIERING**

Castro contends the Agency violated CEQA by preparing the Redevelopment EIR, which Castro argues unnecessarily and confusingly replicated the Specific Plan EIR.

According to Castro, the Redevelopment EIR improperly tiered from the Specific Plan EIR. Castro contends the physical development described in the two EIR's is the same, and in the Redevelopment EIR "virtually nothing new is added."

**Tiering Under CEQA**

CEQA allows agencies to tier subsequent environmental analysis from prior EIR's when feasible: "(a) The Legislature finds and declares that tiering of environmental impact reports will promote construction of needed housing and other development projects by (1) streamlining regulatory procedures, (2) avoiding repetitive discussions of the same issues in successive environmental impact reports, and (3) ensuring that environmental impact reports prepared for later projects which are consistent with a previously approved policy, plan, program, or ordinance concentrate upon environmental effects which may be mitigated or avoided in connection with the decision on each later project. . . .

"(b) To achieve this purpose, environmental impact reports shall be tiered whenever feasible, as determined by the lead agency." (Pub. Resources Code, § 21093.)[3]

CEQA encourages agencies to tier environmental analyses that they prepare for separate but related projects, including development projects. Tiering can eliminate repetitive discussions of the same issues and focus the later EIR on the issues ripe for decision at each level of review. Tiering is appropriate when the sequence of analysis is from an EIR prepared for a general plan to an EIR for another plan of lesser scope, but the agency is not excused from adequately analyzing reasonably foreseeable significant environmental effects of the project. Nor does tiering justify an agency's deferring such analysis to a later-tier EIR. However, the level of detail contained in a first-tier EIR need

_____

[3] All further statutory references are to the Public Resources Code unless otherwise designated.

8

not be greater than that of the program being analyzed. (CEQA Guidelines, § 15152, subd. (b).)[4]

Under section 21094, if an EIR has been prepared and certified for a plan, the agency for a later project shall examine significant effects of the later project on the environment via a tiered EIR. A subsequent EIR is not required to examine effects the agency determines were either (1) mitigated or avoided as a result of the prior EIR, or (2) examined in sufficient detail in the prior EIR to allow those effects to be mitigated or avoided through conditions of approval or by other means in connection with approval of the later project. (§ 21094, subd. (a)(1)-(a)(1)(B).)

Although tiering is permissible in certain circumstances, CEQA requires an agency to analyze the project in its entirety to ensure all potential impacts related to the proposed project are properly considered. (*Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 197-199 (*Stanislaus Natural Heritage*).) The prohibition against segmentation of a project serves to prevent dividing the project into smaller pieces, precluding meaningful and complete analysis of potential environmental impacts. However, environmental impacts of related projects may be analyzed separately when the projects are not dependent on one another. (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 931-932 (*Tracy First*); *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 370-373.)

*Discussion*

Castro contends the Redevelopment EIR violates CEQA since it analyzes the same physical development analyzed in the Specific Plan EIR. According to Castro and quoting from the draft Redevelopment EIR, "The Redevelopment EIR admits that it

---

[4] The Guidelines for Implementation of the California Environmental Quality Act are set forth in the California Code of Regulations, title 14, section 15000 et seq. (CEQA Guidelines).

evaluates no new physical project and includes no new environmental analysis from that provided in the two previous EIRs:

" 'The Railyards Specific Plan/Richards Boulevard Area Plan (RSP/RBAP) EIR analyzed the impacts of redevelopment consistent with the RBAP, which encompasses the same area as the existing Richards Boulevard Redevelopment Project Area. The recently adopted Railyards Specific Plan (RSP) EIR analyzed the impacts of development consistent with the updated Railyards Specific Plan, which covers the majority of the Railyards Project Area. Therefore, this Program EIR tiers from both of these EIRs, and assumes the mitigation measures adopted and required for development within these specific plan areas are a part of the future development within the Project Areas. **No land use changes are proposed as part of the Proposed Project**.' "

Castro contends the boundary change is not a project subject to CEQA, citing *Simi Valley Recreation & Park Dist. v. Local Agency Formation Com.* (1975) 51 Cal.App.3d 648, 652, 662-666. Castro asserts, "A boundary change of a redevelopment plan and a change in the name of a redevelopment plan are not subject to CEQA. Therefore, the only 'project' subject to CEQA review is the [Specific Plan], and the Redevelopment EIR was unnecessary."

The trial court considered the relationship between the two EIR's and found: "The project described and evaluated in the [Specific Plan] EIR and the project described and evaluated in the Redevelopment EIR are separate and independent, though complementary, projects. The [Specific Plan] EIR concerns the development of land uses on the 244 acre [Specific Plan] site by the City under the State Planning and Zoning Law, the City of Sacramento General Plan, and the [Specific Plan]. The Redevelopment EIR concerns the Agency's actions under the Community Redevelopment Law to divide the [Richards Boulevard Plan] Area, establish separate plans for the redevelopment of the 1,068 acre [River District Plan] Area and the 300 acre [Railyards Plan] Area, and approve

10

a Master OPA and an Initial Phase [Infrastructure] OPA with the Developer for the elimination of blight.

"The Agency's planned redevelopment activities to eliminate blight in the [River District Plan] Area and in the [Railyards Plan] Area, where the [Specific Plan] site is located, began well before the [Specific Plan] was conceptualized, are not limited to [Specific Plan] implementation, and are distinct from the City's land use planning activities to develop the [Specific Plan]." The court also noted: "[T]he tax increment funding provided under the Initial Phase [Infrastructure] OPA is a redevelopment activity undertaken pursuant to the [Railyards Plan] project which may facilitate but which does not add any component to and is not part of the [Specific Plan] development project."

CEQA requires an agency to prepare an EIR for any project it determines may have a significant impact on the environment. (CEQA Guidelines, § 15002, subd. (f)(1).) CEQA defines a project as any activity that may have a potential for resulting in a direct or indirect physical change in the environment. (CEQA Guidelines, §§ 15002, subd. (d), 15378, subd. (a).)

Here, approximately 60 acres of the Railyards Project Area lie outside the area subject to the Specific Plan. The amendment to the Richards Boulevard Plan modifies the boundaries of the Richards Boulevard Project Area and creates a new redevelopment plan for the Railyards Project Area. The Agency's initial study identified potentially significant impacts stemming from the project, including impacts to the view corridors on I Street, 4th Street, 7th Street, 9th Street, and 10th Street.

These potential impacts include aesthetics, light, and glare and were not part of the Specific Plan EIR but instead are analyzed in the Redevelopment EIR. The Redevelopment EIR ultimately concluded the potential impacts to the view corridors were less than significant.

Castro rejects any argument that the Redevelopment EIR includes a broader scope of analysis than the Specific Plan EIR, contending the Redevelopment EIR does not

11

analyze a project other than the Specific Plan. According to Castro, the Specific Plan EIR provided an identical analysis of light and glare in the view corridors but provided a more comprehensive evaluation of these aesthetic issues. As for the additional acreage included in the Redevelopment EIR, Castro contends "the 60 downtown acres are of no consequence for CEQA purposes, and as a practical matter the boundaries of the [Specific Plan] and [Railyards] Plan are the same." Tellingly, Castro provides no support for this assertion.

Castro also contends the Redevelopment EIR improperly tiered from the Specific Plan EIR since "[n]o additional level of detail is provided in the Redevelopment EIR because it is not of 'lesser scope' than the [Specific Plan] EIR." In addition, Castro argues, "The Agency's use of tiering also violates CEQA because the Redevelopment Project is broader and more general in nature than the [Specific Plan]."

The trial court found the concept of tiering in CEQA did not preclude the Redevelopment EIR from using the impact analysis in the Specific Plan EIR for the same infrastructure: "The impacts to be analyzed in the Redevelopment EIR for the funding of that infrastructure under the Initial Phase [Infrastructure] OPA would be substantially the same as the impacts that were analyzed in the [Specific Plan] EIR for development of the infrastructure." Moreover, the trial court could "conceive of no reason for the Redevelopment EIR to duplicate the impact analysis already produced by the [Specific Plan] EIR to the extent that it covers the impacts of developing the same infrastructure."

Under section 21094, if a prior EIR has been prepared and certified for a program or plan, the lead agency for a later project that meets the requirements of section 21094 "shall examine significant effects of the later project upon the environment by using a tiered environmental impact report." The agency must determine that the later project is (1) consistent with the program, plan, policy, or ordinance covered by the prior EIR; (2) consistent with applicable local land use plans and zoning of the city, county, or city

12

and county in which the subsequent project would be located; and (3) is not subject to section 21166.  (§ 21094, subd. (b)(1)-(2).)

Here, the Redevelopment EIR is a program EIR related to the prior EIR, is consistent with applicable land use plans and zoning, and is not subject to section 21166. The Redevelopment EIR tiers from the Richards Boulevard Plan EIR and the Specific Plan EIR.  In addition, the Agency found the Redevelopment EIR would not change any land uses analyzed in the Specific Plan EIR.  Section 21166 applies when the subsequent project is not different from the previous project.

Castro also argues the Redevelopment EIR improperly tiered from the Specific Plan EIR because the Redevelopment EIR is broader and more general than the Specific Plan EIR.  In support, Castro quotes CEQA Guidelines section 15152, subdivision (b): " 'Tiering is appropriate when the sequence of analysis is from an EIR prepared for a general plan, policy, or program to an EIR or negative declaration for another plan, policy, or program of lesser scope, or to a site-specific EIR or negative declaration.' "

The trial court rejected this argument, noting the statutory definition "does not, and should not, preclude the use in the Redevelopment EIR of the impact analysis in the [Specific Plan] EIR for the same infrastructure. . . .  The court can conceive of no reason for the Redevelopment EIR to duplicate the impact analysis already produced by the [Specific Plan] EIR . . . ."  Nor can we.  Under the CEQA Guidelines, tiering "can eliminate repetitive discussions of the same issues and focus the later EIR or negative declaration on the actual issues ripe for decision at each level of environmental review. . . .  Tiering does not excuse the lead agency from adequately analyzing reasonably foreseeable significant environmental effects of the project and does not justify deferring such analysis to a later tier EIR or negative declaration.  However the level of detail contained in the first tier EIR need not be greater than that of the program, plan, policy or ordinance being analyzed." (CEQA Guidelines, § 15152, subd. (b).)

13

Castro's arguments to the contrary notwithstanding, the Redevelopment EIR did not violate CEQA in tiering from the Specific Plan EIR.[5]

## IMPROPER SEGMENTATION

Castro contends that because the physical components of the railyards project are addressed in the Specific Plan EIR, there are no additional project components to be analyzed in the Redevelopment EIR. Since the Railyards Plan was prepared solely to provide funding for the Specific Plan, it was part of the "whole of the action" that makes up the railyards project. Therefore, the Agency's certification of the Redevelopment EIR is an impermissible segmentation of environmental review. In support, Castro cites *Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 106.)

The trial court disagreed, finding the purpose of the Railyards Plan is to make tax increment funding available to the developer under the Initial Phase Infrastructure OPA for the construction of certain public facilities on the Specific Plan site. According to the court, "[T]ax increment funding provided under the Initial Phase OPA is a redevelopment activity undertaken pursuant to the Railyards Redevelopment Plan project which may facilitate but which does not add any component to and is not part of the [Specific Plan] development project. Thus the tax increment funding does not add to the [Specific Plan] development project or its impacts on the physical environment and need not be analyzed together with the [Specific Plan] project for purposes of CEQA. The [Specific Plan] development project and the [Railyards Plan] project are separate and independent from each other for purposes of CEQA."

Castro disagrees, arguing the Agency prepared the Railyards Plan solely to fund the Specific Plan. Castro reasons: "Although the [Railyards] Plan and the Specific Plan

---

[5] Since we find no impropriety in the Redevelopment EIR's tiering from the Specific Plan EIR, we need not address Castro's arguments concerning prejudice.

have different functions and arise from a different statutory framework, they have a common purpose to develop the Railyards in accordance with the [Specific Plan]."

CEQA requires an agency to analyze the project in its entirety to ensure all potential environmental impacts related to the proposed action are properly considered. CEQA's prohibition against segmentation strives to prevent an agency from dividing a single project into smaller pieces and stymieing a complete analysis of potential environmental impacts. (*Stanislaus Natural Heritage*, *supra*, 48 Cal.App.4th 182; *Tracy First*, *supra*, 177 Cal.App.4th at pp. 931-932.) Environmental impacts of related projects may be analyzed separately when the projects are not dependent on one another. (*Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712, 732-735.)

In the present case, the Specific Plan project and the redevelopment project have different purposes and cover different areas. The Specific Plan project covers the development of 244 acres within the Richards Boulevard Project Area. In contrast, the redevelopment project consists primarily of two parts: (1) amending the boundaries of the Richards Boulevard Project Area and renaming the Richards Boulevard Plan, which covers 1,068 acres, and (2) creating a Railyards Project Area, covering 300 acres.

As the trial court pointed out, the project described in the Specific Plan EIR and the project described in the Redevelopment EIR are separate and independent, though complementary, projects. The Agency provided two objectives for the Redevelopment Plan: "To enable the Railyards Area to be developed in accord with the new adopted Specific Plan and to provide support and assistance to that development as feasible, necessary and appropriate" and "[t]o protect the remaining Richards Boulevard (River District) Project Area from the costs and other development constraints particularly affecting the Railyards Area." These objectives go beyond merely procuring funds for the Railyards Project Area.

Castro also argues that, under the analysis in *Laurel Heights*, *supra*, 47 Cal.3d at p. 396, "an EIR must include an analysis of the environmental effects of future expansion

15

or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." Castro contends the Railyards Redevelopment Project was a foreseeable consequence of the Specific Plan and would change the scope of the initial project by adding the tax increment financing element.

However, Castro fails to explain how the Agency's decision to amend the Richards Boulevard Plan was a foreseeable consequence of the City's adoption of the Specific Plan. Nor does Castro explain how the action of removing the Railyards Project Area from the larger Richards Boulevard Project Area impacts or changes the nature of the land use entitlements approved in the Specific Plan.

Castro alleges improper segmentation "[b]ecause the physical components of the Redevelopment Project are addressed in the [Specific Plan] EIR, there were no additional Project components to be analyzed in the Redevelopment EIR. The Railyards Redevelopment Plan was prepared solely to provide funding for the [Specific Plan] and was therefore part of the 'whole of the action' that comprises the Railyards Project." Again, the stated objectives of the Redevelopment EIR are not merely to provide a funding mechanism for the project.[6]

## ANALYSIS OF TAC EMISSIONS

Castro argues the Redevelopment EIR fails to analyze and mitigate for TAC emissions. TAC's, or toxic air contaminants, are airborne substances that are hazardous to health, causing acute and chronic adverse health effects. The California Air Resources Board has identified diesel particulate matter (DPM) as a TAC. The railyards are exposed to DPM from local freeway diesel truck traffic and diesel trucks operating on the

---

[6] Since we find no improper segmentation under CEQA, we need not address Castro's claims of prejudice.

16

site, diesel-powered locomotives using rail lines that cross the property, and diesel emissions from vehicles that would use the Sacramento Intermodal Transportation Facility (SITF) proposed for the project site. According to Castro, the Redevelopment EIR failed to set forth a legally acceptable standard of significance for TAC's, no substantial evidence supports the standard of significance adopted, and the TAC evaluation is inadequate.

**Standards of Significance**

CEQA defines a threshold of significance: "Each public agency is encouraged to develop and publish thresholds of significance that the agency uses in the determination of the significance of environmental effects. A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (CEQA Guidelines, § 15064.7, subd. (a).)

The lead agency determines whether an environmental impact is significant and also determines the corresponding threshold of significance. In exercising this discretion the agency may rely on threshold of significance data developed by experts, and may also rely on a regulatory agency. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 362-363 (*Napa Citizens*); *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 625-626 (*Native Plant Society*).)

Thresholds of significance do not automatically determine whether an environmental impact will be significant. Instead, they serve as a marker to determine whether a particular impact will normally be determined to be significant or less than significant. (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1108-1109.)

17

### 1. Redevelopment EIR's Standard of Significance

Preliminarily, Castro faults the Redevelopment EIR for adopting a standard of significance for TAC's that finds significance if "[t]he project would substantially increase the risk of exposure to TACs." Castro argues this is not an acceptable qualitative standard of significance and is "impermissibly vague." According to Castro, the EIR was required to provide a meaningful standard for TAC's as expressed as an increase in the number of cancer cases per million or another metric that is acceptable in the scientific community.

Here, the Sacramento Metropolitan Air Quality Management District (Air District) is the regulatory agency responsible for TAC emissions in the Railyards Project Area. However, the Air District does not have a threshold of significance to recommend on TAC emissions. As stated in the foreword to the Air District's "Recommended Protocol for Evaluating the Location of Sensitive Land Uses Adjacent to Major Roadways," this document "does *not* provide an acceptable cancer risk level or a regulatory threshold; therefore it does not establish which projects are acceptable and which are not. Local land use jurisdictions retain all authority and decide after considering all relevant factors whether the project is appropriate."

As the trial court noted, the Specific Plan EIR, which the Redevelopment EIR incorporates, applied the same qualitative standard of significance to the results obtained by two health risk assessments (HRA) prepared by the Environ Corporation to evaluate TAC's. The court determined: "The EIR used a qualitative rather than a quantitative standard because there is no established risk from exposure to TACs from mobile sources; it is very difficult to set a risk standard from mobile sources; and the existing ambient TAC risk within the [Specific Plan] area already exceeds the TAC risk from stationary sources, an increase of 10 cancer cases per million people, and would not be helpful in measuring whether the TAC emissions from mobile sources project would impact the risk of exposure to TACs in the [Specific Plan] area."

18

Interestingly, Castro does not address or even cite these findings. Instead, Castro focuses on a letter from the Air District dated April 25, 2008. In the letter, the Air District criticized the Specific Plan EIR's analysis of TAC emissions, stating the analysis used in the EIR was outdated and could not be approved at the present time. The letter states: "The Air District contends that without a complete analysis of the impact of various sources of TACs on the proposed project, it is not accurate to say there will **not** be a 'substantial increase in the risk.' " The Air District also recommended that the "proponents perform a site-specific Health Risk Assessment."

Subsequently, the Air District on May 2, 2008, sent a letter stating: "[I]t is the District's understanding that the Draft and Final EIRs have analyzed air quality and toxics impacts based on the information now known. Because this is a program-level EIR, it is understood that more specific information will become available in the future as actual projects are identified and that impacts will be reanalyzed for significance prior to approval of individual projects. The District concurs with this approach."

In its April 25, 2008, letter the Air District expressed concerns about the qualitative standard of significance and the methodology used. However, less than a month later, the Air District accepted the TAC analysis in the Redevelopment EIR, reasoning that it was sufficient for a program-level analysis based on limited information about projects in the River District Plan and the portion of the Railyards Plan not covered in the Specific Plan. The Air District also explained that it concurred in the methodology used in the Specific Plan EIR to assess TAC impacts, but that the methodology was constantly evolving and future projects might be required to use a different or modified analytical approach. Although Castro attempts to undermine the impact of the May 2, 2008, letter, the letter provides evidence the Air District accepted the EIR's TAC analysis despite its earlier misgivings.

19

Castro also argues that the health risks posed by TAC's can only be quantitatively discussed. In support, Castro cites *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344 (*Berkeley Keep Jets*).

In *Berkeley Keep Jets*, the plaintiffs challenged an agency's lack of substantive analysis of TAC's. The appellate court found the agency's TAC analysis defective, in part because the EIR stated the health effects of TAC's were unknown. In addition, the agency relied on outdated information in assessing TAC impacts. (*Berkeley Keep Jets*, *supra*, 91 Cal.App.4th at pp. 1366-1367.) The Agency also failed to research available approved protocols to assess the risks associated with mobile TAC emissions. According to the court, the agency failed to make "any reasonable conscientious effort . . . to collect additional data or to make further inquiries of environmental or regulatory agencies having expertise in the matter." (*Id*. at p. 1370.) For all these reasons, the court concluded the agency must meaningfully attempt to quantify the amount of mobile-source emissions that would be emitted during normal operations and determine whether those emissions would result in significant health impacts. (*Id*. at p. 1371.)

The court in *Berkeley Keep Jets* did not hold that TAC risks can only be examined quantitatively, not qualitatively. Instead, the court considered the woefully inadequate discussion of TAC's in that case and found it wanting. No such egregious gap in analysis appears in the present case. Here, the Specific Plan EIR referenced Air District and Air Resources Board documents in analyzing TAC impacts. The Specific Plan EIR also calculated train and vehicle emissions quantitatively and performed a screening HRA. The Agency reviewed the Specific Plan EIR's TAC analysis and included it in the Redevelopment EIR. The Redevelopment EIR did not run afoul of CEQA in employing a qualitative standard of significance in analyzing TAC emissions and their environmental impact.

20

## 2. *Substantial Evidence*

Castro argues the record does not contain substantial evidence supporting the Redevelopment EIR's TAC standard of significance. According to Castro, the record is devoid of any evidence that an expert in air quality formulated the standard of significance or any evidence supporting the standard of significance. Under CEQA, we must uphold an EIR if there is any substantial evidence in the record to support the agency's decision that the EIR is adequate and complies with CEQA. (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1265; *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1357.)

Castro argues experts "denigrated" the Redevelopment EIR's standard of significance, and the EIR's failure to rebut this criticism denotes a lack of substantial evidence. According to Castro, the rejection of the standard of significance by the Air District's expert and other experts "shifts the burden of proof to the Agency to justify adopting the standard," a burden the Agency failed to meet.

However, disagreement by other agencies or experts over an agency's determination that mitigation measures will reduce an adverse impact does not show that insufficient evidence supports the determination. The burden is on Castro to affirmatively show there was no substantial evidence in the record, not simply that other experts disagreed with the analysis. (*Native Plant Society*, *supra*, 172 Cal.App.4th at p. 626.)

According to Castro, the lack of expert input on the Redevelopment EIR's standard of significance constitutes a dearth of substantial evidence. Castro also faults the EIR for failing to provide the qualifications of the individuals who prepared the EIR. However, Castro fails to cite any authority requiring expert input in the determination of the threshold of significance applied in an EIR. Instead, an agency may rely on regulating agencies or an EIR preparer. (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 369; *Napa Citizens*, *supra*, 91 Cal.App.4th at

21

pp. 361-363.)  Here, the Agency and City relied on the EIR preparers of both the Specific

Plan EIR and the Redevelopment EIR, with input from the Air District and the Air

Resources Board, in developing the TAC analysis.  Substantial evidence supports the

Redevelopment EIR's determination of the applicable standard of significance for TAC

emissions.

**Adequacy of TAC Evaluation**

Castro contends the record does not support the Redevelopment EIR's conclusion

that TAC emissions would be less than significant.  Castro argues the lack of a site-

specific HRA renders the Redevelopment EIR inadequate.

"The determination of whether a project may have a significant effect on the

environment calls for careful judgment on the part of the public agency involved, based

to the extent possible on scientific and factual data."  (CEQA Guidelines, § 15064,

subd. (b).)  According to Castro, the full extent of the Specific Plan EIR analysis is a

screening HRA, which included potential health risks from DPM's from the freeway, rail

lines, and the SITF.  Castro argues the lack of a site-specific HRA in the Redevelopment

EIR, which incorporated the Specific Plan EIR, "is an omission of information from the

EIR necessary for public review of the Project's impacts and informed decision-making."

This failure to include relevant information violates CEQA.

We disagree.  In order to evaluate the health impacts from exposure to DPM,

Environ Corporation prepared two HRA's, which were incorporated into the Specific

Plan EIR.  A screening HRA evaluated the potential cancer risk from DPM emissions

from mobile sources including the freeway, train emissions, and emissions from the

SITF.  The HRA followed the Air District's "Recommended Protocol for Evaluating the

Location of Sensitive Land Uses Adjacent to Roadways."  The HRA also utilized data

from a traffic study by Dowling Associates to evaluate potential risk to any homes built

nearby.  The HRA concluded the cancer risk for residences 200 feet or more from the

freeway was less than the criteria in the Air District protocol and therefore no site-

22

specific HRA was necessary.  In addition, the HRA determined the cancer risk from DPM's from trains was less than the evaluation criterion wherever the residences would be located, and a site-specific HRA was not recommended.

The other HRA evaluated the cancer risk to the community from chemicals that could become airborne from soil disturbance and DPM emissions from construction equipment used on contaminated sites.  The HRA utilized computer modeling and guidance from the California and United States Environmental Protection Agencies, and applied the National Contingency Plan target cancer risk levels.  The HRA concluded the health risk to the community surrounding the Specific Plan area from soil and DPM emissions during construction was less than the National Contingency Plan target risk levels for airborne soil chemicals and slightly higher than 10 in one million for DPM emissions.  The DPM levels would likely be reduced through various mitigation measures.

Substantial evidence supports the Redevelopment EIR's conclusion that TAC emissions would be less than significant.  In addition, the Redevelopment EIR explained why no site-specific analysis was performed.

**Subsequent Projects**

Finally, Castro contends the record includes no factual basis for the Redevelopment EIR's conclusion that " '[e]xposure of sensitive receptors to TACs through the build-out of planned land uses in the Project Areas would be less than significant.' "  According to Castro, the Agency admitted there would be no requirement for all subsequent residential development in the Specific Plan to complete any analysis of TAC impacts.  Our review of the record proves otherwise.

The Redevelopment EIR identifies itself as a "Program EIR."  The Redevelopment EIR states:  "This Program EIR provides a project area-wide environmental analysis and framework for subsequent approvals pursuant to adoption and implementation of the Proposed Project.  As individual activities pursuant to the redevelopment plans are

proposed, the Agency will examine the individual activities to determine whether their effects have been fully evaluated in this Program EIR, and if not, what additional steps should be taken. Additional environmental review for the public and private activities or undertakings pursuant to or in furtherance of the Proposed Project would be required if any of the conditions outlined in [CEQA] Guidelines Sections 15162 or 15163 were to occur."

In addition, in response to comments from the Air District, the Redevelopment EIR states "all future discretionary projects throughout both Project Areas must be independently assessed by the City against the adequacy of existing environmental documentation," and "there are more current [Air District] mitigation measures that would apply to future development projects." The Redevelopment EIR contemplates subsequent environmental review of TAC emissions for future development.[7]

## DISPOSITION

The judgment is affirmed. The Agency shall recover costs on appeal.

                                     RAYE              , P. J.

We concur:

       NICHOLSON       , J.

       HULL             , J.

---

[7] Castro argues extensively that should we find the Specific Plan EIR invalid in a companion case, the Redevelopment EIR should also be decertified. Since we do not find the Specific Plan EIR invalid in the companion case, we need not address this contention. (*Sacramento Citizens*, *supra*, C065220.)